THE STATE OF OHIO, APPELLANT, *v.* HERBERT ET AL.
APPELLEES.

[Cite as State v. Herbert (1976), 49 Ohio St. 2d 88.]

(No. 76-311—Decided December 30, 1976.)

90

Mr. *William J. Brown,* attorney general, Mr. *Stephen C. Fitch* and Mr. *Eugene F. McShane,* for appellant.

Messrs. *Addison & Smith* and Mr. *Richard C. Addison,* for appellee Buckeye Union Ins. Co.

Mr. *Robert F. Gardner, pro se.*

Messrs. *McNamara & McNamara,* Mr. *William H. Woods,* Mr. *Paul Tague* and Mr. *J. Paul McNamara,* for appellees John D. Herbert, Aetna Cas. & Sur. Co., American States Ins. Co., Celina Ins. Co., Cincinnati Ins. Co., and Travelers Ins. Co.

WILLIAM B. BROWN, J. The main issue raised by this cause is whether R. C. 135.14, which allows the treasurer to invest interim moneys in the commercial paper of certain private corporations, alters the common-law standard of liability for loss of public funds by public officials where the investment is in violation of the maximum investment limitation embodied in the statute.

Appellees argue that they are not liable for the investment losses on the King Resources notes for the following reasons: (1) the purchase of notes when the interim funds invested in commercial paper exceed the statutory limit is not illegal (and therefore noncompliance at the time of purchase may be cured if the total amount invested drops below the statutory limit) because the statutory limitation "is upon the aggregate," and the "last investment is no more improper than the first investment or the middle investment"; (2) an examination of R. C. 135.14 shows that the General Assembly intended both "to grant the Treasurer of State authority to invest public funds," and "to change the principles governing the liability of the treasurer for loss of funds invested under the statute"; and (3) "the Treasurer of State is not liable for decrease in value of an investment in commercial paper notes in the absence of proof that the decrease in value was proximately caused by a violation of [R. C. 135.14]."

Appellees' argument that a purchase of the commercial paper notes is not illegal even though it is made in violation of the statutory limitation is not well taken. R. C. 135.14 provides that the treasurer may invest in commercial paper notes "* * * provided that the aggregate total amount of interim moneys invested in commercial paper *at any time shall not exceed* fifty million dollars." (Emphasis added.)

The appellate court did not find that argument persuasive because the statute employs the word "shall" which is "usually mandatory." We agree with the appellate court's conclusion.

Although the word "shall" is sometimes construed

not to be mandatory, it is only given that meaning when the intention that it be permissive "clearly" appears. *Dennison* v. *Dennison* (1956), 165 Ohio St. 146, 149. Nothing in the $50,000,000 limitation provision of R. C. 135.14 shows such a "clear" legislative intent to make the limitation permissive. On the contrary, the provision not only prohibits aggregate investments in excess of $50,000,000, it also prohibits such investments "at any time." The additional emphasis provided by that phrase makes it clear that the General Assembly intended the provision to be mandatory. In light of the legislative intent to make the provision mandatory, appellees' argument that the statutory limitation is only on the "aggregate" and that, in effect, individual investments not in themselves exceeding $50,000,000 do not violate the provision, is without merit. To so interpret the $50,000,000 limitation of R. C. 135.14 would be to render the limitation meaningless. We therefore reject appellees' contention that the purchase of the King Resources notes was not illegal.

Appellees contend that R. C. 135.14 evidences legislative intent to "change the principles governing the liability of the treasurer for loss of funds invested under the statute," because it grants him authority to invest state funds in commercial paper notes of private corporations and holds him not to be accountable, under certain circumstances, for losses due to the unprofitable sale of those notes.

R. C. 135.14, as it read in 1970, provided as follows:

"The treasurer or governing board may invest or deposit any part or all of the interim moneys, provided that such investments will mature or are redeemable within two years from the date of purchase. The following classifications of obligations shall be eligible for such investment or deposit:

"(A) Bonds, notes, or other obligations of or guaranteed by the United States, or those for which the faith of the United States is pledged for the payment of principal and interest thereon;

"(B) Bonds, notes, debentures, or other obligations or

securities issued by any federal government agency, or the export-import bank of Washington;

"(C) Interim deposits in the eligible institutions applying for interim moneys as provided in Section 135.08 of the Revised Code. The award of interim deposits shall be made in accordance with Section 135.09 of the Revised Code and the treasurer or the governing board shall determine the periods for which such interim deposits are to be made and shall award such interim deposits for such periods, provided, that any eligible institution receiving an interim deposit award may, upon notification that said award has been made, decline to accept said interim deposit in which event the award shall be made as though such institution had not applied for such interim deposit.

"(D) Bonds and other obligations of this state.

"In addition to the investments specified in subparagraphs (A), (B), (C), and (D) of this section, the Treasurer of State may invest interim moneys of the state in commercial paper notes issued by any corporation for profit which is incorporated under the laws of the United States, a state, or the District of Columbia, which such notes are rated prime by the National Credit Office, Inc., New York, or its successor, provided that the aggregate total amount of interim moneys invested in commercial paper at any time shall not exceed fifty million dollars.

"Whenever, during a period of designation, the treasurer classifies public moneys as interim moneys, he shall notify the governing board of such action. Such notification shall be given within thirty days after such classification and in the event the governing board does not concur in such classification or in the investments or deposits made under this section, the governing board may order the treasurer to sell any of such securities or certificates of deposit, and any such order shall specifically describe the securities or certificates of deposit and fix the date upon which they are to be sold. Securities or certificates of deposit so ordered to be sold shall be sold for cash by the treasurer on the date fixed in such order at the then current market price. Neither the treasurer nor the members

of the board shall be held accountable for any loss occasioned by sales of securities or certificates of deposit at prices lower than their cost. Any loss or expense incurred in making such sales is payable as other expenses of the treasurer's office.

"If any securities or certificates of deposit purchased under the authority of this section are issuable to a designated payee or to the order of a designated payee, the name of the treasurer and the title of this office shall be so designated. If any such securities are registrable either as to principal or interest, or both, then such securities shall be registered in the name of the treasurer as such.

"The treasurer is responsible for the safekeeping of all securities or certificates of deposit acquired by him under this section. Any of such securities may be deposited for safekeeping with a qualified trustee as provided in Section 135.18 of the Revised Code. Interest earned on any investments or deposits authorized by this section shall be collected by the treasurer and credited by him to the proper fund of the state or subdivision.

"Upon the expiration of the term of office of a treasurer or in the event of a vacancy in the office of treasurer by reason of death, resignation, removal from office, or otherwise, the treasurer or his legal representative shall transfer and deliver to his successor all securities and certificates of deposit held by him. For the securities and certificates of deposit so transferred and delivered, such treasurer shall be credited with and his successor shall be charged with the amount of money invested in such securities and certificates of deposit.

"Whenever securities or certificates of deposit acquired under this section mature and become due and payable, the treasurer shall present them for payment according to their tenor, and shall collect the moneys payable thereon. The moneys so collected shall be treated as public moneys subject to the provisions of Sections 135.01 to 135.21, inclusive, of the Revised Code."

It is a generally accepted rule that " a court must first look to the language of the statute itself to determine the

legislative intent," and that the statute must be applied accordingly if its meaning is "clear, unequivocal and definite." *Provident Bank* v. *Wood* (1973), 36 Ohio St. 2d 101, 105. Although R. C. 135.14 clearly contemplates granting the Treasurer of State power to invest in *kinds* of notes that were not legal investments prior to the December 13, 1967, amendment[2] and although it purports to relieve the treasurer and members of the governing board from liability "for any loss occasioned by sales of securities or certificates of deposit at prices lower than their cost," it does not, on its face, constitute a "significant change in the law governing the handling of public funds" or evidence legislative intent to change the traditional common-law standard of liability for loss of public funds by public officials as appellees contend.

Under R. C. 135.14, the treasurer is a custodian of funds. He is responsible "for the safekeeping" and "transfer" to his successor of "all securities or certificates of deposit held by him" under the statute. He is also required to collect and credit to the proper fund any interest earned on R. C. 135.14 investments.

In addition, he is granted only very limited powers as an investor under R. C. 135.14. He may not invest in notes unless they are (1) payable within two years, (2) given a "prime" national credit rating, and (3) issued by a corporation for profit incorporated under the laws of the United States, a state or the District of Columbia. Furthermore, his purchases of such qualified commercial paper notes are subject to the review and veto of the governing board. Finally, he may only invest the relatively small sum of $50,-000,000 in commercial paper notes.[3]

The exculpatory clause of R. C. 135.14 does not evidence legislative intent to change the treasurer's liability

---

[2]Prior to December 13, 1967, the General Assembly granted the treasurer authority to invest public funds in securities issued by or guaranteed by certain governmental agencies. (See former R. C. 135.142, 131 Ohio Laws 88.)

[3]In 1970, more than $50,000,000 was earned in *interest* on the total investments of the treasurer's office.

for loss of funds to that of an "investor" as appellees contend, or to escape liability when he violates the $50,000,000 limitation. While the provision does address itself to relieving the treasurer and members of the governing board of liability "for any loss occasioned by sales of securities or certificates of deposit at prices lower than their cost," it does so only in a context that spells out the power of the *board of governors* to order the treasurer to sell securities which he has purchased and which the board does not approve. Since the exculpatory clause occurs in a paragraph restricting the treasurer's powers, we do not find it to evidence legislative intent to significantly change "the law governing the handling of public funds."

The third argument posed by appellees is that the Treasurer of State is not liable for the investment loss on the King Resources notes "in absence of proof that the decrease in value was proximately caused by a violation of [R. C. 135.14]."

Over the years, this court has held public officials liable for the loss of public funds, even though illegal or otherwise blameworthy acts on their part were not the proximate cause of the loss of public funds. *State, ex rel. Wyandot County,* v. *Harper* (1856), 6 Ohio St. 607; *Eshelby* v. *Cincinnati Bd. of Edn.* (1902), 66 Ohio St. 71; *Seward* v. *National Surety Co.* (1929), 120 Ohio St. 47. In *Seward, supra,* at page 49, this court stated:

"It has been the general policy, not only with government employees and appointees, but with state officers, county officers, township officers, and all other public officials, to hold the public official accountable for the moneys that come into his hands as such official * * *; that is to say, that when he comes to account for the money received, it must be accounted for and paid over, unless payment by the official is prevented by an act of God or a public enemy * * *."

This rule may seem harsh, but it is based on legitimate policy reasons which are also set forth in the *Seward* opinion:

"* * * it would be distinctly against public policy not

to require a public officer to account for and disburse according to law moneys that have come into his hands by virtue of his being such public officer; that it would open the door very wide for the accomplishment of the grossest frauds if public officials were to present as the defense, when called on to disburse the money according to law, that it had been performed or destroyed by some deputy, or other subordinate, connected with the public office." *Seward, supra,* at page 50.

The appellate court, in the instant case, refused to follow the standard of liability for public officials handling public funds as set out in *Seward* and other cases, on the grounds that its application was "extremely doubtful" in view of "the broadening of the area of allowable investment by the legislature" in R. C. 135.14 "to include commercial paper." Having concluded earlier that R. C. 135.14 does not evidence a legislative intent to change the common-law standard of liability for public officials handling public funds, we must reject the appellate court's decision and find appellees Herbert and Gardner liable, under the *Seward* standard of liability for public officers handling public funds, for the investment losses occasioned by their purchase of the King Resources Company commercial paper notes. Since the liability of surety companies for loss resulting from the illegal acts of a public officer is well established in Ohio (see 44 Ohio Jurisprudence 2d, Public Officers, Sections 115-117), we find appellee surety companies similarly liable. The judgment of the Court of Appeals is reversed.

*Judgment reversed.*

O'Neill, C. J., Celebrezze and Stephenson, JJ., concur.

Herbert, J., concurs in part.

Corrigan and Stern, JJ., dissent.

Stephenson, J., of the Fourth Appellate District, sitting for P. Brown, J.

Herbert, J., concurring in part. It has been established that appellee Gardner knowingly violated R. C.

135.14. But for that malfeasance, the loss incurred by the public would not have transpired. As a matter of public policy, evidenced by the common law, Gardner should be held personally responsible for the proximate consequences of his conduct.

Relying mainly upon *Seward* v. *National Surety Co.* (1929), 120 Ohio St. 47, 165 N. E. 537, the majority decides that appellee Herbert should also be held *personally* liable for the violation committed by his deputy. This conclusion is announced in spite of the agreement of all who have perused the matter, including the trial judge, all three court of appeals' judges, and the seven sitting members of this court, that Herbert at no time had any knowledge Gardner was even considering a violation of the statute. Clearly, Herbert had no inkling of his trusted deputy's acts until they had already been performed. This fact is uncontroverted in the evidence. Furthermore, none of the courts which have considered this cause, including this court, have found any carelessness upon Herbert's part, or have held that he failed to perform his duties in a proper manner.

Upon this record, the majority will force the former treasurer at the least into bankruptcy, and possibly into a lifetime of significant portions of his earnings being regularly taken to apply toward an insurmountable judgment against him. I do not agree that either the law or public policy should mandate this result.

I would disapprove statements in *Seward* to the effect that all public officers are personally liable for whatever is done by people in their employ concerning the handling of public moneys, irrespective of a total lack of fault on the officer's part. Such a rule discourages those who would make the finest of administrators and public officials from ever seeking such offices. The attendant liability is shocking to contemplate, particularly in view of present day criminal statistics and the vastness of some of the offices affected.

The sureties in this action received commensurate fees for the responsibility they assumed. Theirs is a business of balancing risks against premiums and occasionally the

former mature into obligations. However, the hundreds of public officials across the state[4] who are charged with the handling of public or quasi-public funds have the right to rely upon a rule which says to them: If you intentionally or carelessly cause your trust to be violated, you will be held personally liable for its breach.

Therefore, I concur with my colleagues in the majority, but not to the extent that the former Treasurer of State is found to be personally liable for the losses suffered.

CORRIGAN, J., dissenting. This astonishing decision of the majority compels me to stoutly dissent for the following reasons:

### I.

The state of Ohio brought this action against John D. Herbert, former Treasurer of State, Robert F. Gardner, former deputy Treasurer of State, and six sureties to recover interim funds of the state which had been invested in commercial paper notes, pursuant to R. C. 135.14. The claim of the state is based upon the investment of $7,950,000 in two commercial paper notes of King Resources Company in April and May of 1970, and upon the failure of King Resources to pay the notes when they matured in 1972. The state does not allege that Herbert failed to account for any funds of the state or that Herbert or Gardner was guilty of fraud. There is no evidence that either Herbert or Gardner personally profited, or tried to profit, from any transaction involving state funds.

The record establishes that Herbert was elected Treasurer of State in 1962 and was re-elected in 1966. In 1964, Herbert appointed Gardner as his investment officer. Prior to his appointment as investment officer, Gardner had earned a bachelor's degree in economics, a master's degree in accounting and a law degree. He had been employed by a public accounting firm, the Internal Revenue Service, the city of Cincinnati and the First National Bank of Cincinnati. He was a certified public accountant and a member

---

[4] Including the members of this court.

of the Ohio Bar. In 1969 or early 1970, Gardner was promoted to deputy treasurer.

Gardner supervised the investment of funds of the state of Ohio from the time he became assistant treasurer in 1964 until May of 1970. In fiscal year 1969, Gardner invested approximately $400,000,000 in 932 transactions. In 1969, the daily average dollar volume of investments was $15,000,000. In 1970, the daily average dollar volume of investments had increased to $30,000,000.

The funds handled by the treasurer's office increased rapidly during Herbert's two terms as treasurer. In 1962, the treasurer's office handled approximately three billion dollars. In 1970, the treasurer's office handled approximately six billion dollars. The interest earned on investments increased from approximately $7,000,000 in 1962 to approximately $52,000,000 in 1970.

In December of 1967, the General Assembly enlarged the investment powers of the Treasurer of State with respect to interim moneys by amending R. C. 135.142 (now R. C. 135.14). R. C. 135.14 provides:

"In addition to the investments specified in subparagraphs (A), (B), (C), and (D) of this section, the treasurer of state may invest interim moneys of the state in commercial paper notes issued by any corporation for profit which is incorporated under the laws of the United States, a state, or the District of Columbia, which such notes are rated prime by the National Credit Office, Inc., New York, or its successor, provided that the aggregate total amount of interim moneys invested in commercial paper at any time shall not exceed fifty million dollars."

This new power to invest in commercial paper notes was a fundamental change in investment authority that permitted the treasurer to increase income on investments at a greater risk to principal than had previously been permitted. Investment in commercial paper notes began in 1968. In fiscal 1969, the treasurer invested more than $254,-000,000 in commercial paper notes.

This action involves two commercial paper notes of King Resources. On April 17, 1970, Gardner invested in a

commercial paper note of King Resources in the face amount of $3,000,000. This commercial paper note bore interest at 9.5 percent, and was payable 24 months after date. On May 1, 1970, Gardner invested in a commercial paper note of King Resources in the face amount of $5,000,000.

The second commercial paper note bore interest at 9.75 percent, and was payable 24 months after date. Both the trial court and the Court of Appeals held that these commercial paper notes of King Resources complied with the qualitative requirements of R. C. 135.14. No issue regarding the qualitative requirements of R. C. 135.14 is raised by the state in this court.

Early in May 1970, adverse information about the financial condition of Four Seasons Nursing Centers of America, Inc., became a matter of public knowledge for the first time. As a result of this information concerning Four Seasons Nursing Centers, Herbert reviewed the commercial paper portfolio of the state of Ohio. The state of Ohio had invested in three commercial paper notes of Four Seasons. The claims of the state of Ohio relating to the commercial paper notes of Four Seasons have been resolved in another action.

In the course of his review, Herbert learned that the state had invested more than the $50,000,000 limitation in commercial paper notes. Gardner resigned as deputy treasurer on May 12, 1970, and, on the same day, James O. Dayton became acting deputy treasurer. At the direction of Herbert, Dayton sold sufficient commercial paper notes to bring the aggregate total amount of interim moneys invested in commercial paper notes below $50,000,000 on May 12, 1970.

On May 12, 1970, the state of Ohio had sustained no loss of interim money invested in commercial paper notes, and on that date, there was no adverse information about the financial condition of King Resources.

At no time during 1970 were the King Resources commercial paper notes in default. In accordance with the terms of both the $3,000,000 and the $5,000,000 King Re-

sources: commercial paper notes, semi-annual interest payments were made in the first year after the investment by the state of Ohio in King Resources. On the $3,000,000 note, interest was paid to the state of Ohio in the amount of $142,500 on October 20, 1970, and a second interest payment in the sum of $142,500 was made on April 22, 1971. On the $5,000,000 note, interest was paid to the state of Ohio in the amount of $243,750 on October 3, 1970, and a second interest payment in the amount of $243,750 was made on May 3, 1971.

Upon the expiration of his term of office in January 1971, Herbert transferred and delivered to his elected successor all securities held by him, including the two commercial paper notes of King Resources. Herbert fully accounted for all securities, pursuant to R. C. 135.14. *Neither of the commercial paper notes of King Resources was in default when Herbert left office. Full interest payments on each note continued to be made after Herbert left office in January of 1971.* Not until September 12, 1972, more than six months after this action was commenced and approximately 20 months after Herbert left office, were the commercial paper notes of King Resources certified to the Auditor of State as delinquent for collection under R. C. 115.10 and 115.17.

On March 9, 1972, about five weeks less than two years since treasurer Herbert, by his deputy Gardner, had invested in the first commercial paper note of King Resources, and approximately seven weeks less than two years since the purchase by the state of Ohio of the second note, the Attorney General of Ohio commenced this action in the Common Pleas Court of Franklin County against Herbert, Gardner and six sureties.

The complaint filed in this action first asserts that Herbert and Gardner disbursed certain money "purportedly pursuant to Section 135.14, Ohio Revised Code, for alleged commercial paper notes of * * * King Resources, Inc. * * *" In paragraphs 10 and 11 thereof, it is asserted that:

"The said disbursements were made illegally and in neglect of the defendants John D. Herbert's and Robert F.

Gardner's official duties in that when such public funds were disbursed for said alleged commercial paper notes the aggregate total amount of interim treasury moneys invested in commercial paper exceeded fifty million dollars, in violation of Ohio Revised Code Section 135.14. Said disbursements were also made illegally and in neglect of official duty in that the promissory notes received were not in fact commercial paper notes rated prime by the National Credit Office, a division of Dun & Bradstreet, Inc., its successor, or any other commercial paper rating service, also in violation of Ohio Revised Code Section 135.14.

"Plaintiff says that the defendant, John D. Herbert, executed his duties as Treasurer of the state of Ohio with respect to the transactions hereinbefore mentioned with a wilful or gross and reckless disregard for the safety of the public funds of the state of Ohio and the interests of its citizens and taxpayers. Plaintiff further says that the acts herein complained of were committed by the defendant Robert F. Gardner wilfully, intentionally and with full knowledge of their illegality and risk of loss to plaintiff and the citizens and taxpayers of the state of Ohio; further that they were committed with gross and reckless disregard for their legality, and with gross and reckless disregard for the safety and safekeeping of public funds of the state of Ohio, with which the defendant Robert F. Gardner was charged."

The fourth claim of the complaint contends:

"20. For this its fourth claim plaintiff, the state of Ohio, hereby incorporates the allegations of its first, second, and third claims as fully as if rewritten herein.

"21. Plaintiff's fourth claim is brought under the authority of Revised Code Chapter 117, and more specifically Section 117.10 of that Chapter, which provides that the Attorney General shall file an action to recover public funds when the Bureau of Inspection and Supervision of Public Offices of the Auditor of State's Office has certified to him a report finding that such funds were illegally expended and are still outstanding.

"22. Plaintiff further says that on the 16th day of

104

June, 1970, the Bureau of Inspection and Supervision of Public Offices of the Office of the Auditor of State, pursuant to Revised Code Section 117.10, filed with the Office of the Attorney General of Ohio a certified Special Report of Examination concerning commercial paper investments of the Treasurer of State's Office from the inception of such investments to May 8, 1970. Said special report set forth that the disbursements to Four Seasons Nursing Homes, Inc. and King Resources, Inc. were illegal, and that said disbursements were still outstanding."

Plaintiff then demands the following relief:

"(a) That the defendants John D. Herbert and Robert F. Gardner be held jointly and severally liable to plaintiff in the amount of Fourteen Million One Hundred Seventy-Five Thousand Three Hundred Twelve Dollars and Fifty-Five Cents (14,175,312.55) as damages for the aforementioned acts;

"(b) That the defendants John D. Herbert and Robert F. Gardner each be held severally and personally liable to plaintiff in the amount of One Million Dollars ($1,000,-000) as *exemplary or punitive damages* for the aforementioned acts;

"(c) That the defendant The Buckeye Union Insurance Company be held severally liable to plaintiff in the amount of One Million Dollars ($1,000,000) as its liability for the aforementioned acts;

"(d) That the defendants The Aetna Casualty and Surety Company, American States Insurance Company, The Cincinnati Insurance Company, The Celina Mutual Insurance Company, and The Travelers Indemnity Company each be held severally liable to plaintiff in the amount of One Hundred Thousand Dollars ($100,000) as their liability for the aforementioned acts;

"(e) That the court award plaintiff its costs and expenses incurred in the prosecution of this action, including, but not limited to, court costs, attorney's fees, and all other expenses."

It is a noteworthy fact also that the state of Ohio, on April 17, 1972, sued King Resources and 15 other de-

fendants in the United States District Court, Southern District of Ohio, Eastern Division, case No. 72-138, for $8,000,000 plus interest, or rescission of the two promissory notes, claiming that the defendants "as participants, principals, and aiders and abettors, separately and in concert, directly and indirectly, in connection with the sale of the aforementionad promissory notes to plaintiff, knowingly, recklessly, and negligently prepared, issued, and disseminated certain financial statements regarding the financial condition of King and withheld certain financial and business information concerning King as of the date of the purchase of the aforementioned promissory notes by plaintiff, for the purpose of obtaining a 'prime' rating of King from defendant, Dun & Bradstreet, Inc., through its division, the National Credit Office. Such rating was the first necessary, indeed indispensable, step in obtaining loan funds from the state of Ohio in exchange for the promissory notes of King. A 'prime' rating from the National Credit Office was, under the provisions of Section 135.14, Ohio Revised Code, a necessary precondition to plaintiff's purchase of the aforementioned promissory notes. The financial statements and the business and financial information withheld created a materially false and misleading picture of King's financial condition * * *.

"* * *

"27. As a result of and in connection with, the aforesaid violative conduct, plaintiff purchased the aforementioned promissory notes."

The state of Ohio also prays for judgment in that action of $8,000,000 in exemplary damages.

Neither Herbert nor Gardner nor the surety companies are mentioned in that lawsuit, but the promissory notes, which are the subject of that lawsuit, are the same promissory notes which are involved in this appeal.

It is also a noteworthy fact that the state of Ohio, by its Attorney General, William J. Brown, and special counsel retained by him from Denver, Colorado, and Birmingham, Alabama, filed a complaint against a Chicago, Illinois, law firm and 19 of its partners, in the United States

District Court for the District of Colorado, case No. 76-F-992. Involved in this latter lawsuit, again, are the same two promissory notes issued by King Resources, totaling $8,-000,000. In this latter lawsuit, the state of Ohio asserts that some of the defendants, "in connection with the sale of the aforementioned securities to the plaintiff, have employed a device, scheme or artifice to defraud; have made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and have engaged in acts, practices and a course of business which has operated as a fraud or deceit upon plaintiff as purchaser of the aforementioned securities * * *." And, of course, this was done, assertedly, knowingly or recklessly, or with wanton disregard for the consequences of their conduct and the truth of the above representations and opinions. It was in reliance upon these misrepresentations that plaintiff purchased the promissory notes.

In this latter lawsuit also, the state of Ohio prays for $8,000,000 plus interest from the date of the purchase in compensatory damages, and, further, it seeks judgment of $8,000,000, additional, as exemplary damages plus attorney's fees and expenses.

The official bond of John D. Herbert, as principal, and the six insurance companies, as sureties, with the state of Ohio as the obligee, binds Herbert and his sureties that Herbert "shall, during his term of office, faithfully discharge the duties imposed upon him by law as Treasurer of the state of Ohio." The total coverage of that bond is $600,000.

The second bond which is a subject of this lawsuit is a faithful performance blanket bond with coverage of a maximum indemnity limit of $1,000,000. This covered the employees of the treasurer's office under Herbert.

The trial court, after an extended hearing, rendered judgment for all the defendants. Upon the evidence, the trial court found that John D. Herbert as Treasurer of the state of Ohio, and Robert F. Gardner, as an employee of

the state of Ohio, faithfully performed the duties imposed upon each of them by law. The court found further that no act or omission of John D. Herbert, as Treasurer of the state of Ohio, or Robert F. Gardner, as an employee of the state of Ohio, caused any loss to the state of Ohio. The trial court made findings of fact and conclusions of law as part of its decision.

The Court of Appeals affirmed and the cause is before us by virtue of our allowance of plaintiff's motion to certify.

## II.

This cause is rife with confusion and abounds in non-sensical theories coupled with foolish claims by the Attorney General of Ohio. The trial judge did a superior job in disposing of frivolous demands asserted by the state of Ohio, such as punitive damages and attorney's fees which apparently were thought by the Attorney General to lie under his theory that Gardner, when he invested interim funds under R. C. 135.14 in excess of the $50,000,000 limitation was, with Herbert, negligent as a matter of law because such investments were allegedly made with a willful, intentional, gross and reckless disregard for the safety of the public funds of Ohio. The trial judge disposed likewise of the state's tortured theory of trusts, and the theory that the Treasurer of State is an insurer of the safety of state funds in his custody.

It is important to keep uppermost in mind that this appeal relates solely to the claim of the state of Ohio based on the fact that the $50,000,000 provision of R. C. 135.14, in respect to investments in commercial paper notes of King Resources, Inc., was exceeded.

It would seem that even the Attorney General would be able to understand that the liability of the Treasurer of State for the decrease in value of an investment in commercial paper notes is to be determined solely under the provisions of R. C. 135.14.

The state claims that the defendants are liable for the decrease in value of the King Resources notes because, at the time the investments were made, more than $50,000,-

000 was invested in commercial paper notes, and therefore the investments were illegal. The conclusion that the King Resources notes were illegal investments because they were made when more than $50,000,000 was invested in commercial paper notes is not supported by any analysis or citation of authority. Further, the state argues that, based upon the conclusion that the King Resources investments were illegal, the defendants are liable for the decrease in value of the King Resources notes even in the absence of proof that the decrease in value of the notes was proximately caused by the alleged illegality of the investments.

Whether the defendants are liable for the decrease in value of the investments in King Resources must be determined under R. C. 135.14.

Effective December 13, 1967, the General Assembly amended R. C. 135.142 (now R. C. 135.14) to permit investments by the Treasurer of State in commercial paper notes of private corporations. The amendment was a significant change in the law governing the handling of public funds. Historically, the Treasurer of State was a custodian of state funds and property. See 49 Ohio Jurisprudence 2d, State of Ohio, Section 19; *State, ex rel. Rothbacher*, v. *Herbert* (1964), 176 Ohio St. 167. In *State* v. *Buttles* (1854), 3 Ohio St. 309, this court recognized the early policy of the state on safekeeping of public funds. Paragraph two of the syllabus in *Buttles* states:

"The policy of this state, in view of all our statutes regulating the collection, safe-keeping and disbursement of the public money, has always been to prohibit its officers and agents from loaning or dealing in its funds, on public or private account; a few exceptions where officers have been authorized by special statutes to loan or otherwise improve particular funds, only make the general rule the more manifest."

Since the *Buttles* decision, the General Assembly has substantially changed the public policy regarding public funds. R. C. Chapter 135, Uniform Depository Act, contains the primary statutes which govern the handling of

the funds of the state and its political subdivisions and which permit the investment of public funds. Prior to December 13, 1967, the General Assembly granted the treasurer authority to invest public funds in securities issued by or guaranteed by certain governmental agencies. The 1967 amendment to R. C. 135.142, as later enacted in R. C. 135.14 in 1968, permitted the treasurer to invest in commercial paper notes which are unsecured promissory notes of private corporations. The creation and expansion of the authority to invest public funds allowed the treasurer to invest interim moneys in securities which generate greater interest than is paid by a depository bank.

The acceptance by the General Assembly of the principle that public funds may be invested is a substantial departure from the earlier law stated in the *Buttles* decision. The *Buttles* decision places the safeguarding of public funds above all other considerations. By authorizing the investment of public funds, the General Assembly recognized the desirability of earning income from investment of public funds. Black's Law Dictionary (4 Ed. 1968), at page 960, defines the term "investment" as "[t]he placing of capital or laying out of money in a way intended to secure income or profit from its employment." Investment in commercial paper notes, which are unsecured promissory notes, involves a risk. Such investment involves a greater risk than investments earlier authorized under the predecessor to R. C. 135.14.

An examination of the provisions of R. C. 135.14 demonstrates that the General Assembly not only intended to grant the Treasurer of State authority to invest public funds, but also intended to change the principles governing the liability of the treasurer for loss of public funds invested under the statute. The statute is comprehensive and defines the duties and liabilities of the treasurer as an investor of public funds. This court has stated that legislative intent is to be determined primarily by an examination of the language of the statute. In *Provident Bank* v. *Wood* (1973), 36 Ohio St. 2d 101, 105 (the only prior decision of the court interpreting the terms of R. C. 135.14), we stated:

"* * * It is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent. See, e. g., *Katz* v. *Department of Liquor Control* (1957), 166 Ohio St. 229. If that inquiry reveals that the statute conveys a meaning which is clear, unequivocal and definite, at that point the interpretative effort is at an end, and the statute must be applied accordingly. *Sears* v. *Weimer* (1944), 143 Ohio St. 312."

R. C. 135.14, as enacted in 1968, provides in detail for investment of interim moneys, including investment in commercial paper notes. The statute grants the treasurer authority to purchase commercial paper notes which meet certain qualitative standards. The qualitative standards define the character of the investment risk permitted by the General Assembly. The statute requires that investments in commercial paper notes be (1) issued by a corporation for profit incorporated under the laws of the United States, a state, or the District or Columbia, (2) rated prime by the National Credit Office, Inc., New York, and (3) payable within two years. Both the trial court and the Court of Appeals held that the commercial paper notes of King Resources complied with the qualitative standards of the statute. R. C. 135.14 also provides for the registration of securities in the name of the treasurer and directs him to report to the governing board with respect to the classification of public moneys as interim moneys and the investment of those interim moneys. The statute provides that neither the treasurer nor the members of the governing board shall be held accountable for loss occasioned by sales of securities at prices lower than their cost. Finally, the statute directs the treasurer to transfer to his successor the securities held by him at the expiration of his term, and gives him credit for the securities so delivered.

The intention of the General Assembly to distinguish between the duty of the treasurer as a custodian and the duty of the treasurer as an investor is made clear by language in the following paragraphs of R. C. 135.14, which read, in part:

"The treasurer is responsible for the safekeeping of

all securities or certificates of deposit acquired by him under this section. Any of such securities may be deposited for safekeeping with a qualified trustee as provided in Section 135.18 of the Revised Code. * * *

"Upon the expiration of the term of office of a treasurer or in the event of a vacancy in the office of treasurer by reason of death, resignation, removal from office, or otherwise, the treasurer or his legal representative shall transfer and deliver to his successor all securities and certificates of deposit held by him."

These provisions indicate that the General Assembly intended to make the treasurer a custodian of the securities and certificates of deposit acquired by the state of Ohio. The statute requires the treasurer, as the custodian of the securities, to account for the securities and deliver them to his successor. The treasurer is credited with the amount of money invested in the securities regardless of the value at the time of the delivery to his successor.

The statute states:

"For the securities and certificates of deposit so transferred and delivered, such treasurer shall be credited with and his successor shall be charged with the amount of money invested in such securities and certificates of deposit."

The statute specifically exonerates the treasurer from liability for decrease in the value of the investments:

"Neither the treasurer nor the members of the board shall be held accountable for any loss occasioned by sales of securities or certificates of deposit at prices lower than their cost. Any loss or expense incurred in making such sales is payable as other expenses of the treasurer's office."

In summary, the General Assembly has from time to time changed the law on public funds. Under R. C. 135.14, the treasurer is not only a custodian of public funds but also an investor. The statute authorizes investment in commercial paper notes, which are unsecured promissory notes of private corporations. Investment in commercial paper notes involves risk of decrease in value. Liability for decrease in the value of investments in commercial paper

notes must be determined under R. C. 135.14. That statute provides that the treasurer is not liable for decrease in value. Under the statute, decrease in the value of commercial paper notes is borne by the "treasurer's office," i. e., by the state of Ohio.

### III.

Appellees contend with persuasion that the investments in commercial paper notes of King Resources, when the amount invested in commercial paper notes exceeded the $50,000,000 provision of R. C. 135.14, do not make such investments illegal. They urge that the Treasurer of State is not liable for a decrease in the value of such investments occurring when less than $50,000,000 was invested in commercial paper notes.

The entire argument presented by the state is that the commercial paper notes of King Resources were an "illegal investment" at the time such investments were made in April and May of 1970, and remained illegal. The state has not presented any analysis or authority in support of the contention that the investments were illegal. In support of its assumption of illegality, the state makes the following inaccurate statement:

"The illegality of the purchase of the King Resources' notes by former Deputy Treasurer Gardner in April and May, 1970 has never been seriously challenged by the appellees throughout the proceedings in this case."

From the beginning of this litigation, the appellees have denied that the investments in King Resources were illegal.

The $50,000,000 limitation provision of R. C. 135.14 is a limitation upon the aggregate total amount to be invested in commercial paper notes. Consequently, the purchase of additional commercial paper notes when the aggregate total amount invested in commercial paper notes exceeds $50,000,000 does not make the individual investment illegal. The aggregate total invested is greater than the amount stated in the statute, but the individual investment is not improper. Because the limitation is upon the aggregate, the last investment is no more improper than the first investment or the middle investment.

The distinction between a limitation upon an aggregate amount and a prohibition of an individual investment is illustrated by a comparison of the language found in R. C. 135.14, and the language found in R. C. 2109.371. R. C. 2109.371 provides, in pertinent part:

"*No investment shall be made* pursuant to this section which, at the time such investment is made, causes the aggregate market value of the investments, not made eligible by Section 2109.37 of the Revised Code, to exceed sixty per cent of the aggregate market value at that time of all of the property of the fund held by such fiduciary." (Emphasis added.)

R. C. 2109.371 makes an individual investment improper, whereas R. C. 135.14 places a limitation upon the aggregate, without reference to an individual investment.

The distinction between R. C. 135.14 and 2109.371 is important because the use of different language gives rise to a presumption that different meanings were intended. *Metropolitan Securities Co.* v. *Warren State Bank* (1927), 117 Ohio St. 69, 76. Further, to construe the $50,000,000 aggregate provision as applying to each individual investment requires the court to add words to R. C. 135.14. This court has consistently refused to alter the terms of a statute by adding or deleting words to make the statute conform to an interpretation advocated by a party. *Seeley* v. *Expert, Inc.* (1971), 26 Ohio St. 2d 61; *Wheeling Steel Corp.* v. *Porterfield* (1970), 24 Ohio St. 2d 24; *Columbus-Suburban Coach Lines* v. *Pub. Util. Comm.* (1969), 20 Ohio St. 2d 125.

The characterization of the King Resources investments as "illegal investments" does not assist the court in determining the intention of the General Assembly under the facts of this case. Nothing in the language of R. C. 135.14 states that an investment, made when the aggregate investment exceeds $50,000,000, is illegal. The risk of loss on the investment in King Resources did not increase because the aggregate investment exceeded $50,000,000. The King Resources notes had each of the qualities of a proper investment under R. C. 135.14. It is such qualities which relate to the risk of loss on any individual investment and

not the aggregate amount invested in securities of the same class.

Regardless of the characterization of these investments during the time that the $50,000,000 limitation was exceeded, any classification of "legal" or "illegal" is erased when the aggregate investment in commercial paper notes is reduced below the $50,000,000 limitation without loss. Once the aggregate amount invested is below the limit, no purpose is served by characterizing some investments as "legal" and others as "illegal." All the investments are proper because each of the requirements of R. C. 135.14 is met.

This principle has been recognized in the administration of trusts. 3 Scott on Trusts (3d Ed. 1967), 1880, Section 230.5, states as follows:

"Where a trustee makes an investment which at the time when he makes it is not a proper trust investment, but which subsequently becomes a proper trust investment, and no loss has been incurred in the meantime, the trustee is not subject to liability even though thereafter the investment depreciates in value. After the investment has become a proper trust investment, it would be absurd to require the trustee to sell it if he could immediately properly repurchase it. * * *"

See, also, 6 Bogert, Trusts & Trustees (2d Ed. 1960), 433, Section 614; Restatement of Trusts 2d (1959), Sections 229, comment c and 230, comment f.

The application of this principle to the facts of our case shows that liability should not be imposed on the grounds that the investments were "illegal." On May 12, 1970, the aggregate total invested in commercial paper notes was reduced to below $50,000,000. No loss had been incurred on the King Resources notes as of May 12, 1970. From May 12, 1970, until Herbert left office, the investments in the commercial paper notes of King Resources complied in all respects with the requirements of R. C. 135.14. The loss alleged in this action is unrelated to the quantity of commercial paper notes held by the state in April and May of 1970 when the investment in King Resources was made.

The loss resulted from risks which are inherent in the investment in commercial paper notes.    The exoneration clause of R. C. 135.14 reflects clearly that the General Assembly did not intend to subject the treasurer to liability for loss resulting from investment risks.

This court has held that a trustee is not liable for a loss suffered as the result of an investment which was improper when made, but which became proper before the loss occurred.    See paragraph three of the syllabus in *Miller* v. *Proctor* (1870), 20 Ohio St. 442.  3 Scott on Trusts, *supra*, at page 1881, Section 230.5, states:

"* * * Similarly in *Miller* v. *Proctor* the trustees made a loan of trust funds on insufficient security but subsequently induced the borrower to substitute sufficient security.  It was held that the trustees were not liable, although the substituted security later depreciated so that a loss ensued. * * *"

Likewise, in *State, ex rel. Smith,* v. *Leonard* (1936), 192 Ark. 834, 95 S. W. 2d 86, the Treasurer of State of Arkansas had deposited funds in a bank in excess of the amount permitted by law.  The excess deposit otherwise met the requirements of the law, including a pledge of bonds to secure the deposit. The level of deposits was thereafter reduced to be under the limit provided by law.  Subsequently, a loss occurred by reason of the bank closing and the marked drop in value of the security (road improvement bonds) which collateralized the deposit including the time when it was excessive.  A settlement was approved by the Attorney General in an amount less than the total loss.  On appeal, the state of Arkansas argued that the treasurer was liable for the whole loss because he exceeded the deposit limit.  The Supreme Court of Arkansas held that a causal connection must exist between the violation (exceeding the deposit limit) and the loss.  The court stated "* * * and it is undisputed that the state has suffered no loss by reason of the fact that the deposit was in excess of that authorized by law."

These authorities support the position that the investment in King Resources notes when the $50,000,000 provi-

sion of R. C. 135.14 was exceeded do not make the investments "illegal." No loss was suffered by the state on the King Resources notes during the time the limitation was exceeded. At the time of the decrease in value, the investments satisfied the requirements of R. C. 135.14 in all respects. Under the terms of the exoneration clause of R. C. 135.14 and under established principles of trust law, the treasurer is not liable for any decrease in value of the King Resources notes.

## IV.

The Attorney General in an eruption of spurious zeal for the public weal seeks to create some new principles of negligence law when he urges that the violation by a public official of a statute designed for the safety of public funds constitutes negligence *per se* and the official and his sureties are liable for the loss of any funds proximately caused by the violation.

He disagrees with the Court of Appeals. He argues:

"The Court of Appeals rejected this final theory of liability by holding that the doctrine of negligence *per se* was designed to protect the safety of the public and could not be extended to protect the safety of public funds. * * * The court did not elaborate on its reasons for drawing this distinction except to say that the state had failed to cite a case in support of this theory. While no case has been found to date which addresses itself to this issue, the lack of precedent does not prevent this court from finding negligence *per se* in this case.

"The Court of Appeals seems to suggest that the injury contemplated by the statute must be a direct injury such as physical harm or property damage. However, the loss of public funds constitutes a real, although indirect, injury to every citizen of this state. As stated in *Taylor* v. *Webster,* 12 Ohio St. 2d 53 (1967), at p. 56:

" 'It is the settled law of this state that where a legislative enactment imposes upon a person a specific duty for the protection of others, his failure to observe that duty constitutes negligence *per se.* (Citations omitted.)' "

The case of *Taylor* v. *Webster* is a totally inept cita-

tion of an alleged authority for the position the Attorney General takes. What he studiously neglected to say about *Taylor* v. *Webster* was that it is a case where the defendant, being the owner of an air gun, negligently permitted its use by her ten-year-old son which resulted in physical injury to plaintiff. The Attorney General did not include in his brief paragraph one of the syllabus in *Taylor* v. *Webster*, which reads:

"That part of Section 2903.06, Revised Code, which forbids the owner or one having control of an air gun to knowingly permit its use by a minor under 17 years of age, imposes a specific rule of conduct designed to protect others, and the violation of such a statute is negligence *per se.*"

There is about as much legal sense to this air rifle analogy of the Attorney General, as there was to his blunderbuss theory of pleadings, as evidenced by the complaint filed in this case.

But that is not all. The Attorney General continues:

"In this case, the legislature imposed a specific duty on the treasurer not to invest more than a stated amount in commercial paper notes. This duty was imposed upon the treasurer for the protection of the public against an unreasonable risk of loss of public funds. The legislature recognized, as has the Court of Appeals, that a commercial paper note is nothing more than an unsecured promissory note and that investments in commercial paper involve a greater risk of loss than investments in government bonds or other secured obligations. The General Assembly thus sought to limit the state's exposure to that risk of loss by placing an absolute dollar limitation on such investments. The treasurer, however, through his deputy, not only failed to observe that limitation but knowingly and intentionally violated it on numerous occasions throughout the spring of 1970. This continuous investment of public funds in excess of that permitted by statute exposed the state to a higher risk of loss than that which the legislature determined to be reasonable or prudent. As a result, the negligence of the appellees is established as a matter of law.

"The Court of Appeals further held that even if the appellees' negligence were established, liability would not attach because the proximate cause of the loss was the bankruptcy of King Resources Company. * * *

"Proximate cause is a legal term of art describing the scope of the risks for which liability is imposed for the breach of a given legal duty. The question presented to this court is whether the legal duty breached was designed to protect against the type of injuries sustained—whether the loss was within the ambit of risk protected. Prosser phrases the question as follows:

" '[W]as the defendant under a duty to protect the plaintiff against the event which did in fact occur.' Prosser on Torts, Section 41 (4th Ed. 1971).

"Thus, it is important to examine the purpose of the duty imposed.

"The policy of the statute is clear. It is designed to insure the safe investment of public funds. By not following the safeguards of the statute, Herbert and Gardner exposed the state to unwarranted risks with foreseeable results—loss to those to whom they owe the duty imposed by the law, the people of Ohio. This loss was precisely the risk contemplated by the legislature when it placed the investment safeguards in the statute.

"Section 135.14, as part of the Uniform Depository Act, has as its overriding purpose the safeguarding of public moneys and must be construed strictly to effectuate this purpose. *State* v. *McKelvey, supra* at p. 94. An examination of Section 135.14 demonstrates that it is carefully designed to guard against imprudent investments and to assure the safety of public funds to which it applies. It is designed to prevent precisely what happened here—the loss of public funds through excessive dealings in and investment exposure to unsecured private securities which are inherently riskier than government securities otherwise authorized by the statute. What happened in the present situation was exactly what the legislature had foreseen as the natural and probable consequence of uncontrolled investment of the state's moneys in commercial paper notes when it

placed the fifty million dollar limitation in the statute. Accordingly, proximate cause clearly has been demonstrated."

But enough of such effusions of illogic. The right of the Attorney General to base a cause of action, under the facts in this case, on negligence *per se* is again highly questionable. At best, any workable cause of action would appear to be trespass to chattels, which Prosser describes as: "largely as a little brother to conversion." See Prosser on Torts, *supra,* pages 76 *et seq.*

In any event, proximate cause is an essential element of a cause of action allegedly based on negligence *per se.* And, under the theory of the case of the state of Ohio, the Treasurer of State is not liable, in the absence of proof that any decrease in value of an investment in commercial paper notes was proximately caused by a violation of R. C. 135.14. The Court of Appeals properly so held.

Where a claim of negligence is based upon a violation of a statute, proximate cause must be proven. As is stated in 39 Ohio Jurisprudence 2d 558, Negligence, Section 48:

"It is a well-established rule of law that the violation of a statute or ordinance, to result in liability for injury to person or property, must be a proximate cause of such injury. Where the negligence complained of is a violation of a duty enjoined by statute or ordinance, the plaintiff must show a causal connection between the injury received and the violation of the statute or ordinance. Negligence consisting of the violation of a statute or ordinance is without legal consequence unless it is the proximate cause of the injury, and it is necessary to allege and prove facts showing that the breach of the statute or ordinance was the proximate cause of the injury."

This court has stated that in order to show proximate cause, the following question must be affirmatively answered:

"Was there any unbroken connection between the wrongful act and the injury, a continuous operation?" 22 Ruling Case Law 135 (cited with approval in: *Mouse* v. *Central Savings & Trust Co.* [1929], 120 Ohio St. 599,

606; *Mudrich* v. *Standard Oil Co.* [1950], 153 Ohio St. 31, 38; the discussion of "proximate cause" in *Mudrich* is cited with approval in *Taylor* v. *Webster, supra* [12 Ohio St. 2d 53], at page 57).

The state did not prove an unbroken connection between the investment in the King Resources notes in April and May of 1970, when more than $50,000,000 was invested in commercial paper notes, and the decrease in value of the notes in the fall of 1971. The fact that the excess investment was eliminated on May 12, 1970, more than a year before the default in payment of interest, shows that no such connection existed. The evidence established that on May 12, 1970, the aggregate investment in commercial paper notes was reduced below $50,000,000. Interest was paid regularly on the King Resources notes in 1970 and during the first half of 1971. Herbert completed his term as treasurer in January 1971 and transferred the King Resources notes to his successor. There was no default with respect to the King Resources notes at the time Herbert left office and there was no default for well over a year after the inventory of commercial paper notes had been reduced below $50,000,000.

The trial court stated:

"The one conclusion that is obvious is that the loss is not attributable to the fact that investments exceeded $50,000,000 when these five notes were purchased. The entire testimony indicates that the loss would have occurred even if the state's C. P. investments had been zero when these investments were made. Therefore, it is apparent that the violation of the $50,000,000 provision of 135.14 was not a cause or reason for the loss which the state claims in the instant complaint."

The Court of Appeals affirmed the trial court's finding. The Court of Appeals stated:

"* * * we find that the undisputed unusual circumstance of the bankruptcy of King Resources was the proximate cause of the loss."

In *Gillen-Crow Pharmacies* v. *Mandzak* (1966), 5 Ohio St. 2d 201, 205, this court stated:

"This court, is not required to and does not ordinarily weigh evidence, and a situation, of the kind now before us comes within the rule that where similar factual findings are made by the Court of Common Pleas and the Court of Appeals on appeal they must be accepted by this court unless there is *no* evidence of probative value to support them. *McNab v. Board of Park Commrs. of Metropolitan Park Dist. in Cleveland*, 108 Ohio St. 497, 500, 141 N. E. 332; *Peer v. Industrial Commission*, 134 Ohio St. 61, 67, 15 N. E. 2d 772, 775; 3 Ohio Jurisprudence 2d 782, Section 806."

The evidence established that the cause of the decrease in the value of the King Resources notes was the circumstance surrounding the bankruptcy of King Resources. The cause of the loss is described in detail in the complaint filed by the state in case No. 72-138 in the United States District Court for the Southern District of Ohio. That action was filed against officers of King Resources and various persons and corporations who provided the state of Ohio with information regarding the financial status of King Resources before the notes were purchased. The allegations of the complaint in case No. 72-138 show that the acts and omissions of the defendants in that case were the cause of the decrease in value of the King Resources notes. Several of the claims, in the District Court action, are based on the fraudulent conduct of the defendants, including the first claim which alleges in part that those defendants "engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the plaintiff [*i. e.*, state of Ohio] as purchaser of such securities. * * * " The complaint in the District Court alleges numerous violations of the security laws of this state and of the United States. The Attorney General of Ohio testified that the complaint had been prepared at his direction and that the statements made therein were true.

## V.

The Attorney General also argues that the Treasurer of State is an insurer of funds entrusted to his care and cites certain cases as authorities, which, again, are not ap-

plicable to this case. To repeat, we are dealing here with public funds invested by the Treasurer of State in commercial paper notes as provided by R. C. 135.14.

Under R. C. 135.14, the Treasurer of State is no longer a mere custodian of public funds; he is an investor. The early Ohio cases cited by appellant in support of the proposition that the treasurer is an insurer of public funds are not applicable to the duties of the treasurer as an *investor* of funds. The state cites three decisions of this court in support of the argument that the treasurer is an insurer of public funds: *State, ex rel. Wyandot County,* v. *Harper* (1856), 6 Ohio St. 607; *Eshelby* v. *Cincinnati Bd. of Edn.* (1902), 66 Ohio St. 71; and *Seward* v. *National Surety Co.* (1929), 120 Ohio St. 47. These cases do not involve the investment of public funds, or a statute which expressly relieves the treasurer of liability for decrease in the value of investments.

*State, ex rel. Wyandot County,* v. *Harper, supra,* is clearly not applicable. The *Harper* case involved an action against the former Treasurer of Wyandot County. The petition alleged that, upon leaving office, Harper failed to pay over to his successor a balance due of $2,000. Harper filed an answer which alleged that his residence was forcibly broken open by an unknown person, that $2,010 of public funds was taken, and that the money was taken from him without any fault or want of care on his part. Counsel for the plaintiff moved to strike the answer because it contained no valid defense. The Supreme Court held that answer should be set aside for insufficiency. If the *Harper* case were to arise today, Harper would have had the benefit of R. C. 131.18, which states:

"When a loss of public funds, entrusted to a county or municipal corporation treasurer * * * results from fire, robbery, burglary, flood, or inability of a bank to refund public money lawfully in its possession belonging to such public funds, the board of county commissioners * * * may release and discharge such treasurer * * * from all personal liability to or demands of such county * * * for the loss so created unless the loss resulted from his negligence or other wrongful act."

The purpose of R. C. 131.18 is to relieve the public official of liability in the circumstances which Harper alleged to be true in his case in 1856.

*Eshelby* v. *Cincinnati Bd. of Edn., supra,* shows the change in the nature of the duties of a treasurer. The *Eshelby* case did not involve a loss of public funds. That case dealt with the duty of a public official to account for interest earned on the deposit of public funds. The court, at page 74, stated:

"* * * It does not aid an inquiry as to what the law is to suggest that the district would not be injured by the deposit of its funds at interest payable to the custodian since he may deposit it without interest. The suggestion does not appear to have been favorably considered by the legislature since it has indicated that while he may deposit it *he may not in any manner invest it.* The safety of public funds has been the chief object of care." (Emphasis added.)

The *Eshelby* decision shows that early cases cited by the state were based on a public policy opposed to investment of public funds. This public policy is not applicable to the treasurer as an investor under R. C. 135.14.

Nor is the decision in *Seward* v. *National Surety Co., supra,* applicable in this case. *Seward* dealt with the failure of a postmaster to account for $1,260. The decision does not involve the investment of public funds in securities and it does not involve the interpretation of any statute governing the liability of a public official. The *Seward* decision is based upon the common law of Ohio as it existed in 1929. The court, at page 49, stated:

"It has been the general policy, not only with government employees and appointees, but with state officers, county officers, township officers, and all other public officials, to hold the public official accountable for the moneys that come into his hands as such official, and his obligation has been held to be as broad as is the obligation of a common carrier of freight received for shipment; that is to say, that when he comes to account for the money received, it must be accounted for and paid over, unless payment by the official is prevented by an act of God or

a public enemy; and burglary and larceny and the destruction by fire, or any other such reason, have not been accepted by the courts as a defense against a claim for the lost money."

The principles relied upon by the court in the *Seward* decision are inconsistent with the present law of Ohio as stated in statutes such as R. C. 131.18 and 135.14. The *Harper* and *Seward* decisions were based upon the failure of a custodian of public funds to account for the funds. In this case, Herbert accounted for all funds in the manner provided by R. C. 135.14, when he left office.

The cases cited by the state deal with the common-law duties of a custodian of public funds. In *Bd. of Edn.* v. *McLandsborough* (1880), 36 Ohio St. 227, the court held that a custodian of public funds is not liable for the loss of the funds under the rule stated in *State* v. *Harper* if the legislature has relieved the custodian of liability by statute.

R. C. 135.14 contains two clauses which relieve the treasurer of liability as an insurer. The first clause states:

"Neither the treasurer nor the members of the board shall be held accountable for any loss occasioned by sales of securities or certificates of deposit at prices lower than their cost. Any loss or expense incurred in making such sales is payable as other expenses of the treasurer's office."

The second clause states:

"Upon the expiration of the term of office of a treasurer or in the event of a vacancy in the office of treasurer by reason of death, resignation, removal from office, or otherwise, the treasurer or his legal representative shall transfer and deliver to his successor all securities and certificates of deposit held by him. For the securities and certificates of deposit so transferred and delivered, such treasurer shall be credited with and his successor shall be charged with the amount of money invested in such securities and certificates of deposit."

These authorities do not prove that the treasurer is an insurer of funds invested under R. C. 135.14. The clause

exonerating the treasurer from liability for decrease in market value, and the clause providing that the treasurer is to be credited with the funds invested in securities which are transferred to his successor, demonstrate that the General Assembly did not intend the treasurer to be an insurer of the funds invested under this statute.

### VI.

Next, the state contends that the Treasurer of State is a trustee with respect to public funds and is held to the same standards of strict liability as the trustee of a private trust fund.

The authorities cited by the state do not support its contention. Taking, first, *Crane Twp., ex rel. Stalter,* v. *Secoy* (1921), 103 Ohio St. 258, we find that it does not involve the investment of public funds. Rather, it has to do with the loss of funds held in the custody of a township clerk as a result of the issuance of warrants in blank.

The case of *Home Savings & Loan Co.* v. *Strain* (1935), 130 Ohio St. 53, is used by the state in support of the argument that proof of a causal relationship between a violation of R. C. 135.14 and a loss in the value of the notes is not necessary. However, *Home* does not involve investment by a public official and is not an action for damages against a private trustee. The action was brought by trustees to impress a trust upon funds invested in a savings and loan association. The liability of the trustees for any loss of funds invested was not discussed. The issue presented was whether the trustees had authority to invest in stock of a savings and loan company. The principles stated in *Home* are not applicable to this action because the state does not contend that the treasurer was not authorized to invest in commercial paper notes of King Resources.

The other authorities cited by the state show that proof of a causal relationship between the loss and the alleged breach of trust is an essential element of the liability of a private trustee. 3 Scott on Trusts, *supra,* at page 1669, Section 205.1, cited by the state, states:

"The trustee is liable for any loss which results from

a breach of trust. A question may arise, therefore, as to the causal connection between the breach of trust and the loss. * * *"

Restatement of Trusts 2d, *supra*, at page 460, Section 205, comment *f*, cited by the state, states in part:

"As is stated in Clause (a), a trustee is liable for a loss resulting from a breach of trust. A question may arise, therefore, as to the causal connection between the breach of trust and the loss. If the trustee commits a breach of trust and if a loss is incurred, the trustee may not be chargeable with the amount of the loss if it would have occurred in the absence of a breach of trust."

9 Bogert, Trusts & Trustees (2 Ed. 1962), at page 89, Section 871, states:

"* * * If he [the beneficiary] seeks damages, a part of his burden will be proof that the breach caused him injury. Evidence which merely shows a decrease in the value of the trust property, without showing that the trustee wrongfully caused the shrinkage, does not make a case. * * *"

This court has recognized that a private trustee is not an insurer of funds invested. See *Willis* v. *Braucher* (1909), 79 Ohio St. 290; *In re Estate of Bentley* (1955), 163 Ohio St. 568. This court has also held that a trustee is not liable for loss on an investment which is improper when made but which becomes proper prior to a loss being incurred. See *Miller* v. *Proctor* (1870), 20 Ohio St. 442.

Therefore, the authorities cited above show that the liability of the treasurer is not to be determined by the law applicable to private trustees. The liability of the treasurer is to be determined by R. C. 135.14. The treasurer is not liable to the state in the absence of proof of a causal relationship between the violation of R. C. 135.14 and the loss alleged.

## VII.

The Attorney General, from the shallow of his profundity, advances another theory of liability that he asserts is not predicated on Ohio case law, but, instead, is based upon specific statutory provisions relating to the recovery of illegally expended funds. He suggests that

R. C. 117.10 and 117.11 provide a statutory cause of action for the recovery of public funds illegally expended; that in an action brought under these sections liability attaches where it is established that public funds have been illegally expended and remain unpaid; and that no proof of causal relation need be shown. He contends that these sections create a substantive right of action which eliminates the requirement of proximate cause between the loss of funds and a violation of R. C. 135.14.

R. C. 117.10 and 117.11 are remedial statutes. See *State, ex rel. Smith,* v. *Maharry* (1918), 97 Ohio St. 272. It is doubtful if a perfect definition of "substantive law" or "procedural or remedial law" can be devised. However, the authorities agree that, in general terms, substantive law is that which creates duties, rights, and obligations, while procedural or remedial law prescribes methods of enforcement of rights or obtaining redress. *State, ex rel. Holdridge,* v. *Indus. Comm.* (1967), 11 Ohio St. 2d 175, 178; *State* v. *Elmore* (1934), 179 La. 1057, 155 So. 896; *Manuel* v. *Carolina Cas. Ins. Co.* (La. App. 1961), 136 So. 2d 275; 40 Words and Phrases (Perm. Ed.), 857; *Hicksville* v. *Blakeslee* (1921), 103 Ohio St. 508.

Accordingly, these sections do not change the substantive law of Ohio by granting the state authority to recover funds under R. C. 135.14 without proof of proximate cause between a violation of the statute and a loss to the state.

The Attorney General, for whatever reasons, seems intent on making new law. Although that is sometimes a worthy endeavor, I see no merit in his exercise in this case.

## VIII.

It is hornbook law that the liability of a surety exists only in the event there is liability of the principal. Herbert is the principal in the official bond of the Treasurer of State which was undertaken by the six sureties. Gardner is a principal in the public employees blanket bond executed by Buckeye Union, which is also one of the six sureties on Herbert's bond.

As has been demonstrated, *supra*, neither Herbert nor Gardner is liable to the state of Ohio on account of the investments in King Resources in commercial paper notes by Gardner, pursuant to R. C. 135.14. A statute which provides for the giving of a bond, such as R. C. 135.14, becomes a part of the bond and imparts into it the conditions prescribed by the statute. *Cusack* v. *McGrain* (1939), 136 Ohio St. 27.

Under this statute, the provision that the treasurer shall not be held accountable for loss occasioned by sales of securities at prices lower than their cost becomes a part of the two bonds. Similarly, the provision of R. C. 135.14 directing the treasurer to transfer to his successor the securities held by him at the expiration of his term and gives him credit for the securities so delivered, became part of these two bonds. This latter provision was complied with by Herbert when his term of office expired in January 1971. At that time he transferred and delivered to his elected successor all securities held by him including the two commercial paper notes of King Resources. Neither of these commercial paper notes was in default when Herbert's term ended. Full interest payments on each note continued to be made after Herbert left the office of Treasurer of State, and it was not until September 12, 1972, more than 20 months after Herbert left office, when the commercial paper notes of King Resources were certified to the Auditor of State as delinquent for collection under R. C. 115.10 and 115.17. Also, at the time Herbert completed his term, the $50,000,000 limitation in commercial paper notes had been effected and the notes, transferred to his successor, were yielding interest at face value.

The surety's liability is dependent upon, and can be no greater than, that of the principal. 50 Ohio Jurisprudence 2d, Suretyship, Section 42, states:

"As a general rule, a surety's liability is dependent upon, and can be no greater than, that of the principal, and the surety is not liable for an obligation for which his principal is not liable. Hence, there can be no right of

action against the surety, as such, prior to the existence of such right against his principal. Until the liability of the principal is fixed and determined, a right of recovery against his surety will not accrue. * * *"

See, also, 44 Ohio Jurisprudence 2d, Public Officers, Section 113; *State, ex rel. Commrs. of Knox County*, v. *Blake* (1853), 2 Ohio St. 147; *State* v. *Kuhner & King* (1923), 107 Ohio St. 406, 421.

There is no liability of Herbert and Gardner, and, therefore, there is no liability of the six sureties.

## CONCLUSION.

In December of 1967, the General Assembly amended R. C. 135.142 (now R. C. 135.14) to permit investment of interim moneys in commercial paper notes, *which are unsecured promissory notes of private corporations.*

The only issue in this case is whether investing in commercial paper notes of King Resources, at a time when the aggregate amount invested in commercial paper notes exceeded $50,000,000, makes the treasurer liable for a subsequent decrease in value of the investment in King Resources notes at a future time, when the aggregate amount invested in commercial paper notes was less than $50,000,-000.

This case does not involve a failure of the treasurer to account for funds, or a failure of the treasurer to turn over to his successor the securities of which he is custodian.

Liability for decrease in value of the investment in King Resources notes is to be determined solely under R. C. 135.14, which is a comprehensive, detailed statute that includes both exoneration and accounting clauses. Under that statute, the treasurer is not an insurer, and decrease in value of investments in commercial paper notes is to be borne by the "treasurer's office," *i. e.*, by the state of Ohio, unless there is proof that a violation of the statute proximately caused the decrease.

Both the trial court and the Court of Appeals held that exceeding the $50,000,000 provision was not the proximate cause of the decrease. The decisions of the trial court and the Court of Appeals do not change or modify the

law of Ohio. The decisions of the trial court and the Court of Appeals emphasize the difference between a unique case arising under R. C. 135.14, which is an investment statute, and the older cases which arose when the treasurer was essentially a custodian of public funds. In this case, there was no proof that an act or omission of Herbert or Gardner was the cause of the decrease in value of the investment in King Resources notes. The state has admitted in pleadings filed in other courts that the cause of loss to the state was the acts or omissions of officers of King Resources and various persons and corporations, who provided the state with information on the financial status of King Resources.

In the absence of proof that Herbert or Gardner is liable, there is no liability of the sureties.

To recapitulate, when treasurer Herbert learned, early in May 1970, that his deputy, Gardner, had exceeded the $50,000,000 limitation of investments in commercial paper notes under R. C. 135.14, he accepted Gardner's resignation and appointed Dayton as acting deputy treasurer. At the direction of Herbert, on that date, Dayton sold certain commercial paper notes, from the treasurer's portfolio, sufficient to bring the aggregate total amount of interim moneys invested in commercial paper notes to below the $50,000,000 limitation. *It is most important to note that this was accomplished on May 12, 1970.*

As of that date, *May 12, 1970,* the state of Ohio had suffered no loss of interim money invested in commercial paper notes and, as of that date, there was no adverse information about the financial condition of King Resources. At no time during the balance of the year 1970, and not until long after Herbert's term ended in 1971, were the two notes of King Resources in default. On October 20, 1970, interest on the $3,000,000 note was paid to the state of Ohio in the amount of $142,500. A second interest payment was made to the state of Ohio on that note on April 22, 1971, after Herbert had left office. On the $5,000,000 note, interest in the amount of $243,750 was paid to the state of Ohio on October 3, 1970. A second interest payment in the

amount of $243,750 was similarly made to the state of Ohio on May 3, 1971, four months after Herbert left the office of Treasurer. The decrease in value of the two notes obviously occurred after this date, and how that decrease in value can be ascribed, by the majority of this court, to the original investment in the two notes back on April 17, 1970, and May 1, 1970, respectively, defies reason, logic, common sense, justice, the statutory law, Ohio case law, and the United States Constitution.

In the face of the record and the statutory and case law applicable to the facts, this decision of the majority constitutes a grave denial of fairness and of due process to these two former public officials and their sureties. I would affirm the Court of Appeals.

STERN, J., dissenting. The majority asserts that Ohio common law requires that public officials stand as insurers against any loss of public funds, apparently without regard either to the nature of their custody or authority over the funds, or to the reasons for the loss. I do not agree that this is the only standard of liability which may be applied, and I do not believe that it is the appropriate standard in this case.

Early Ohio cases held that county treasurers were insurers of public funds, based upon statutory language which was construed to impose such a standard contractually. *State, ex rel. Wyandot County,* v. *Harper* (1856), 6 Ohio St. 607; *Bd. of Edn.* v. *McLandsborough* (1880), 36 Ohio St. 227. The court has also held that a postmaster is strictly liable for the loss of public funds which he was to hold and turn over to the federal government. *Seward* v. *National Surety Co.* (1929), 120 Ohio St. 47, 165 N. E. 537. But this court has also stated that "[i]t is pretty well settled under the American system of government that a public office is a public trust, and that public property and public money in the hands of or under the control of such officer or officers constitute a trust fund, for which the official as trustee should be held responsible to the same degree as the trustee of a private trust fund." *Crane Town-*

*ship, ex rel. Stalter,* v. *Secoy* (1921), 103 Ohio St. 258, 259, 132 N. E. 851. See, also, *State, ex rel. Smith,* v. *Maharry* (1918), 97 Ohio St. 272, 119 N. E. 822. The *Crane* case involved the liability of township trustees for loss caused by their disregard of statutory safeguards for the payment of public funds. This case is more directly analogous to the facts of the present case than is *Seward,* for the duties of the treasurer and his deputy which are involved here are basically those of selecting investments within the statutory guidelines, purchasing and managing the notes, and accounting for the profits and losses which result, and the claim of liability is based upon disregard of a statutory mandate, as in *Crane,* not upon a loss by theft or embezzlement of money held simply to be paid over, as in *Seward.*

Further, all those duties which R. C. 135.14 imposes upon the treasurer are typical of those imposed upon a trustee with a duty to invest, but they are unlike the duties of an insurer. Certainly the statute does not impose the duty of insurer upon the treasurer, for it specifically holds that he is not chargeable for losses.

In seeking to impose the standard of insurer, where the treasurer exceeds his authority, it becomes unclear just what rights the state properly has with regard to the notes. May the state properly assert that the treasurer is liable upon the one hand because he exceeded his authority, and, on the other hand, that the maker of the notes is also liable because the notes were purchased by the treasurer as its agent? That is the position the state asserts in its suit upon the notes.

I do not point out the logical difficulties with the insurer theory of liability to argue that some judicial solution might not be found. However, it does seem to me that any such holding would necessarily distort the legal meaning of the insurer relationship, and would do so by disregarding the familiar principles of law which have been developed over the centuries to govern legal relationships of the type created by R. C. 135.14. If this were a private fund, and the treasurer had assumed the very same duties under a private contract, there would be no doubt that the

position created would be that of a trustee. The treasurer, as trustee, would be held to have assumed the familiar duties to faithfully carry out the trust instrument, and the usual remedies against the trustee for any breach of those duties would apply.

I see no reason why the General Assembly, when it establishes such a fund as this for purposes of investment of state funds, not to carry out any governmental purpose but simply to gain a profit in the same manner as any private investor, should not be held to have created a trusteeship and to have acquired the same rights as any other *cestui que trust*. Whether a public officer is in general held to a higher standard as a matter of contract or public policy, where the General Assembly establishes a classic trust in everything but name, as it has here, and has neither established a statutory standard of behavior nor set the trust to the carrying out of a governmental function which would entitle the state to greater protection than other trust beneficiaries, it should be held to have established a trust governed by the principles of trust law. I would apply that standard here, and hold that the defendants should be held responsible to the same degree as private trustees of private trust funds, as the court stated in *Crane, supra*.

It is clear that under those principles, both the treasurer and his deputy herein committed a breach of trust. Specific statutory directions imposed a limit of $50,000,000 upon investments in commercial notes. Any purchase by the treasurer or his deputy of an investment which caused this limit to be exceeded was a breach of trust, and any such investment was improper. It is also well-established that if a trustee purchases a non-legal investment and thereby commits a breach of trust, then the beneficiaries may elect to require the trustee to make good from his own funds the losses to the trust which the breach has caused, and that the *cestui que trust* is entitled to a lien on the investment, which becomes the trustee's individual property, to the extent of the loss. 3 Scott on Trusts (3 Ed.), 1695, Section 210; 7 Bogert, Trusts and Trustees (2 Ed.), 418, Section 705. Under that principle, the appellees herein would, in general, be strictly liable for the loss caused by their breach.

However, under the facts of this case, a further principle applies. It is established that immediately after appellee Herbert discovered the overpurchases of commercial notes, and before any loss had occurred, he ordered that some of the commercial notes be sold to bring the fund within the statutory limits. At the conclusion of that sale and thereafter, all of the commercial notes were legal invesments. Each note in the portfolio met all the requirements established by statute as of May 12, 1970, long before any loss was sustained, and there was no reason to question the safety of the King Resources notes.

As stated in 3 Scott on Trusts, *supra*, at page 1880, Section 230.5:

"Where a trustee makes an investment which at the time when he makes it is not a proper trust investment, but which subsequently becomes a proper trust investment, and no loss has been incurred in the meantime, the trustee is not subject to liability even though thereafter the investment depreciates in value." As Scott further points out:

"After the investment has become a proper trust investment, it would be absurd to require the trustee to sell if he could immediately properly repurchase it." See, also, 6 Bogert, Trusts and Trustees (2 Ed.), 433, Section 614; Restatement of Trusts 2d, Sections 229, comment *c*, and 230, comment *f*.

In *Miller* v. *Proctor* (1870), 20 Ohio St. 442, it was held that private trustees who are at fault in taking insufficient security for a loan, but who subsequently cause the borrower to substitute other security which would have been sufficient for the original loan, are not to be held accountable for a loss happening through unforeseen defects in the latter security, despite their original breach of trust. The court rejected the claim that they should be held absolutely liable for the breach of trust, where they had cured the breach before any loss and where the subsequent loss was the result of an unforeseen defect.

The same reasoning should apply in the present case, since the King Resources notes had become fully legal investments long before any loss occurred. I would accordingly affirm the judgment of the Court of Appeals.