In re Vacation of Township Road 114, Hancock County.

74

(No. 685—Decided May 4, 1966.)

Mr. *William B. Saxbe*, attorney general, and *Mr. Allan D. Dobnicker*, for appellant.

*Mr. Richard J. Rinebolt* and *Mr. R. E. Rakestraw*, for appellees.

GUERNSEY, J.   On March 3, 1965, the Director of Highways of the state of Ohio, acting under the provisions of Section 5553.041, Revised Code, filed his petition with the Board of County Commissioners of Hancock County, Ohio, for the vacation of a portion of Township Road 114, an east and west road located in that county and hereinafter referred to as T-114. The portion described to be vacated consisted of all of the road lying between the east and west right of way lines of Interstate Route No. 75, hereinafter referred to as I-75, which at that point consists of a limited-access four-lane highway with the two northbound lanes separated, except at the intersection, from the two southbound lanes by a median strip.   As now constituted, T-114 and I-75 intersect at grade at approximately right angles.   The effect of the vacation would be to eliminate the intersection and to deny T-114 either access to I-75 or traverse over or under it, there being no present plans to build a bridge or an underpass for such purpose.

After appropriate proceedings by and before the county commissioners as provided by Section 5553.04 *et seq.*, Revised Code, they found "that said improvement will not serve the public convenience and welfare, and the said VACATION is therefore, REFUSED."   From this order the Director of Highways perfected his appeal to the Common Pleas Court of Hancock

County, Ohio. Upon the hearing thereof evidence was introduced for and against the reasonableness and necessity for the vacation, and the court subsequently entered its finding and judgment "that the action of the commissioners * * * refusing to vacate a portion of Township Road 114, was not unreasonable, in light of the evidence, and such action is therfore affirmed." It does not appear that any transcript of the evidence adduced at the hearing before the commissioners was filed with or considered by the Common Pleas Court, and the evidence adduced before that court is included in a bill of exceptions filed by the Director of Highways in his appeal to this court. The director has made four assignments of error.

His first assignment is that the lower court erred in overruling his demand for a trial by jury. This assignment is based on the claim that the procedure on the appeal to Common Pleas Court is governed by the provisions of Section 5563.01 *et seq.*, Revised Code, and that Section 5563.05 prescribes "the trial of the case by jury."

That portion of Section 5553.041, Revised Code, relating to the appeal from the commissioners' action provides, with emphasis added:

"* * * The *Director of Highways or an owner of property abutting on the portion of the highway to be vacated* may *within thirty days* appeal *to the Court of Common Pleas* of the county in which such highway is located *upon the reasonableness of the action* of the commissioners and *the court* may *affirm or revoke* the action of the commissioners and may direct the commissioners to proceed with said vacation as petitioned for. At said *hearing* before said Common Pleas Court evidence may be introduced for or against the reasonableness and necessity for said requested vacation. * * *."

On the other hand, Section 5563.01 *et seq.* include the following provisions, with emphasis added:

Section 5563.01: "* * * *any person,* firm, or corporation *interested,* has effected an appeal, then the order shall not be executed until the matters appealed from have been disposed of *in the Probate Court or the Common Pleas Court.*"

Section 5563.02: "*Any person,* firm, or corporation *interested therein, may appeal* from the final order or judgment of the board of county commissioners * * *.

"* * *

"In case the petition for an improvement is dismissed, or the prayer thereof is not granted, then a person, firm, or corporation desiring to appeal therefrom must *give notice* as provided by this section *on the date when the order is made* dismissing said petition, or refusing to grant the prayer thereof, and *file the bond* required within the time prescribed."

Section 5563.05: "* * * he shall fix a day * * * *for the trial of the case* by jury. * * *"

Section 5563.09: "* * * the parties shall offer their evidence * * * upon the matters appealed from. The rules of law and procedure governing civil cases in the Court of Common Pleas apply to the trial of the cause in the Probate Court."

Section 5563.10: "* * * The jury shall also determine in its verdict whether the improvement petitioned for or granted will be conducive to the public convenience and welfare * * *. The court shall also make a finding for or against the improvement, based on the verdict of the jury. * * *"

We particularly note the following distinctions in these appellate provisions:

| Section 5553.041 | Section 5563.01 *et seq.* |
|---|---|
| 1. Appeal is by Director of Highways or an owner of property abutting on the portion of the highway to be vacated. | 1. Appeal is by any person, firm, or corporation interested. |
| 2. Appeal is to Common Pleas Court. | 2. Appeal is to either Common Pleas or Probate Court. |
| 3. Notice of appeal must be filed within thirty days. | 3. Notice of appeal must be filed on the date when the order is made. |
| 4. Provides for *hearing* before Common Pleas Court. | 4. Provides for *trial* by jury. |
| 5. Court may *affirm* or *revoke* action of commissioners and may direct the commissioners to proceed with said vacation as petitioned for. | 5. Court makes a *finding* for or against the improvement based on the verdict of the jury. |

It is obvious from these distinctions that Section 5553.041, Revised Code, provides for a special appeal from road vacation proceedings initiated by the Director of Highways and that this appeal is independent from and not governed by any of the provisions of Section 5563.01 *et seq.*, Revised Code, relating to appeals from other road improvement proceedings before a board of county commissioners. To the extent that the procedure for the appeal is not prescribed by Section 5553.041, reference must then be made to the Appellate Procedure Act, Section 2505.01 *et seq.*, Revised Code, as applicable. As neither Section 5553.041.nor Section 2505.01 *et seq.*, Revised Code, provide for a jury trial of the Director of Highways' appeal to the Common Pleas Court, and provide merely for a hearing by the court, appellant's first assignment of error is not well taken.

In his second assignment of error appellant claims that the Common Pleas Court erred in granting the motion of certain landowners to join the appeal as "parties—defendant." There is no statutory provision for making parties defendant to the appeal. However, in every appeal, unless otherwise prescribed, the adversary parties in the original proceedings who are not parties appellant automatically become parties appellee. It appears from Section 5553.041 that the parties to the original proceeding adversary to the Director of Highways are the owners of property abutting on the portion of the highway to be vacated. It appears from the record before us that the parties made "defendant" to the appeal by the Common Pleas Court were abutting property owners. Although it was not necessary for the court to formally make them parties to the appeal, there is no showing of any prejudicial error in the court's doing so, and the second assignment of error is not well taken.

In his third assignment appellant claims that the decision of the trial court is against the manifest weight of the evidence; and in his fourth, that the judgment of the trial court is unreasonable, "inasmuch as the improvement petitioned for is necessary and reasonable within the meaning of Section 5553.-041, Revised Code." These two assignments of error complement each other and involve many of the same subordinate issues, and we shall consider and dispose of them together.

As in the hearing of the appeal to the Common Pleas Court, "evidence may be introduced for or against the reasonableness

and necessity for said requested vacation," and the court "may direct the commissioners to proceed with said vacation." Such appeal has features of a trial *de novo*. However, as the proceedings on appeal are described as a "hearing," and not as a trial, and as there is no provision that such proceedings supersede the proceedings of the commissioners, but it is provided, instead, that the court "may affirm or revoke the action of the commissioners," the appeal has aspects of an appeal on questions of law only. In operative effect the appeal here to the Common Pleas Court has similarities to the appeal reviewed by the Supreme Court in the case of *Andrews* v. *Board of Liquor Control*, 164 Ohio St. 275, wherein Judge Stewart concluded at page 280 that the statute there involved provided "for a hybrid review * * * before the Court of Common Pleas, which is one neither strictly of law nor of law and fact but is" something short of a trial *de novo* and something beyond a mere law review. As also indicated by the *Andrews case,* in our review of the proceedings of the Common Pleas Court we "must be guided by the nature and scope of the appellate jurisdiction of the Court of Common Pleas under" the provisions of the applicable statutes.

Section 5553.041, Revised Code, prescribes that the appeal shall be "upon the reasonableness of the action of the commissioners" and that evidence may be introduced "for or against the reasonableness and necessity for said requested vacation." It further provides, however, that the "director may petition the county commissioners to vacate such highway in the same manner that freeholders may petition under Sections 5553.04 to 5553.11, inclusive, of the Revised Code." Section 5553.07, relating to the final hearing by the board of county commissioners, provides as follows:

"The board of county commissioners shall at the date of the final hearing on the proposed improvement read the report of the county engineer, and it shall hear any testimony bearing *upon the necessity of the improvement for the public convenience or welfare* and offered either for or against proceeding with the improvement by any interested persons.

"If the board finds such improvement will *serve the public convenience and welfare,* it shall by resolution enter such finding on its journal and determine to proceed with the improve-

ment. If it finds such improvement will not serve *the public convenience and welfare,* it shall refuse to proceed with the improvement.'' (Emphasis added.)

It consequently appears that the scope of the review by the Common Pleas Court of action by the commissioners refusing to vacate a public highway on petition of the Director of Highways is to determine whether the conclusion of the commissioners that the vacation was not necessary for the public convenience and welfare is reasonable. It being provided that at the hearing before the Common Pleas Court evidence may be introduced for or against the *reasonableness and necessity* for the requested vacation, it follows that the Common Pleas Court must consider all the evidence offered, must appraise it as to the credibility of the witnesses, its probative character and weight, and arrive at its own conclusion as to each of the subordinate issues, namely, (1) whether the vacation was necessary for the public convenience and welfare, and (2) whether the action of the commissioners in refusing to vacate the highway was reasonable. Should it determine the vacation necessary for the public convenience and welfare it would automatically follow that the commissioners' refusal to vacate was not reasonable, and vice versa.

Once the Common Pleas Court makes this determination we may not find differently and enter final judgment, unless we do so as a matter of law. We may not enter final judgment if upon weighing the evidence we find merely that the judgment of the Common Pleas Court is manifestly against the weight thereof.

The director's relevant evidence consists of the testimony of a state highway patrolman as to the occurrence of a fatal accident at or near the intersection caused by the movement of a car from the traveling lane to the passing lane of I-75 with the possible intention of making a left turn into T-114, and as to the posted speed limits on I-75 of 55 miles per hour for commercial vehicles of two tons and over and of 70 miles per hour for passenger cars; the testimony of the Hancock County Engineer as to his recommendation to the commissioners that the intersection be closed by vacating the portion of T-114 described in the petition; the testimony of a state highway department design and planning engineer that crossroads at grade limit the ca-

pacity of an interstate highway by congesting traffic, are dangerous, and are prohibited by federal design standards, that the only alternative to closing T-114 is the construction of an overhead bridge at an estimated cost of $239,000, that the cost of physical removal of the existing intersection upon vacation would probably not exceed $5,000, that four different eight hour traffic counts, weighted for each twenty-four hour period, respectively, revealed 32, 24, 39, and 22 cars traveling on T-114 and traversing I-75, and that "to a certain extent" it is true that the state highway department was satisfied with the existing intersection until the federal government required that it be closed; and the testimony of the Division Engineer of the Federal Bureau of Public Roads that federal interstate highway design standards prohibit intersections at grade between interstate highway systems and local roads such as T-114 because such intersections encourage extreme development at the intersections which soon restricts the capacity built into the highway to carry traffic, and that highways built "with full control of access are very much safer than highways with access permitted wherever desired."

The landowners' relevant evidence consists of their own testimony that they move farm equipment on T-114 across I-75, that to move same by any other route is circuitous and more dangerous, that a school bus uses the intersection for the same reason, and that the access road which would otherwise have to be used is not always plowed free of snow in the wintertime; the testimony of the president of the Van Buren School Board and assistant fire chief of the Van Buren Fire Department that school buses use the intersection in question as well as the intersection of County Road 220 and State Route 18, and that if a fire call were made from a home west of the intersection in question the fire truck would use such intersection in preference to other routes which would take more time; the testimony of the Van Buren School Superintendent that school buses are routed through the intersection because it is less dangerous than other routes where visibility, road incline and turning radii are less favorable; and the stipulated testimony of a propane gas truck driver that in his opinion it is less hazardous to use the intersection than it is to use the nearest overhead over T-75.

The term "public welfare" is a comprehensive expression which may embrace health, peace, morals, safety, economic welfare, convenience, community prosperity, and, in regard to users of public highways, even includes comfort and peace of mind. 81 Corpus Juris Secundum 8, Social Welfare, Section 1; 73 Corpus Juris Secundum 1058, Public Utilities, Section 33, note 54; *Sessions* v. *Crunkilton,* 20 Ohio St. 349, 356; and *Ghaster Properties, Inc.,* v. *Preston, Dir.,* 176 Ohio St. 425, 438.

Interstate Route 75 is a part of the Federal Aid Highway System established by the provisions of Section 101 *et seq.,* of Title 23 of the United States Code, and constructed by the participating states with federal financial assistance when the routes and construction thereof conform to federal standards and receive the approval of the Secretary of Commerce. As provided in Section 103(d), Title 23, U. S. Code:

"* * * It shall be so located as to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers, to serve the national defense and, to the greatest extent possible, to connect at suitable border points with routes of continental importance in the Dominion of Canada and the Republic of Mexico. * * *."

And in Section 109, Title 23, U. S. Code, it is provided that:

"(a) The Secretary shall not approve plans and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality.

"(b) The geometric and construction standards to be adopted for the Interstate System shall be those approved by the Secretary in cooperation with the State highway departments. Such standards, as applied to each actual construction project, shall be adequate to enable such project to accommodate the types and volumes of traffic anticipated for such project for the twenty-year period commencing on the date of approval by the Secretary * * *. The Secretary shall apply such standards uniformly throughout all the States."

These quoted provisions and the other provisions of the same act relating to interstate highways are part of the "Federal-Aid Highway Act of 1958" referred to in Section 5531.06, Revised Code, to wit:

"The Director of Highways may accept any allotment of funds by the United States, or any department or agency thereof, appropriated under the 'Federal-Aid Highway Act of 1958' and any subsequent legislation either supplementary or amending such act."

By the adoption of that section (as well as others, *e. g.*, Section 5512.02, Revised Code) the Ohio Legislature has authorized the construction and improvement of highways on the Ohio highway system with federal aid as part of the interstate highway system, and in determining considerations of public welfare with respect to such highways as are to be, or as have been, so constructed or improved, the purposes and considerations expressed and implied in the Federal-Aid Highway Act should be taken into account. The Supreme Court has already recognized this in the case of *City of Lakewood* v. *Thormyer, Acting Dir.*, 171 Ohio St. 135, where Judge Putnam (sitting by designation) stated in the course of his opinion, p. 147:

"* * * The lessons of World War II, the changing international picture since then, and the unexpected population increase in this state and nation, together with the attendant increase in motor-vehicle registration, have presented transportation problems undreamed of 25 years ago. The national concern is evidenced by the multibillion-dollar aid program authorized by the Federal Aid Highway Act. Most certainly, national defense was a prime consideration in this program. The situation is in continuous flux. With all the foresight of the past ten years, new problems continually arise with advanced technology. We can take judicial notice that even now many bridges and underpasses thought sufficient a few years ago must now be replaced to accommodate new missile and other defense weapon transportation. Naturally the route and design of a relocated facility on an f. a. p. highway is of concern and subject to the approval of both the Director of Highways and the federal authority. *Local self-interest must give way to the general welfare.*" (Emphasis added.)

In determining what evidence pertains to the questions

here involved and to the ultimate issue as to whether the conclusion of the commissioners that the vacation was not necessary for the public convenience and welfare is reasonable, the spheres of governmental jurisdiction and influence tend to control, as well as complicate, the matter. Though the federal government sets the construction standards and supplies much of the financial aid for an interstate highway, the authority and responsibility for construction is carried out by the state director of highways under the provisions of state statutes. Although the Director of Highways may construct an interstate highway over or under an intersecting township road he is not invested with authority to close or vacate a township road in order to deny access of that road to the highway. *Hulbert* v. *Linzell, Dir.,* 167 Ohio St. 350. And until a township road, or a portion thereof, is vacated by appropriate proceedings or an interstate highway is carried over or under it, the public is entitled to have the status quo continued by having the road maintained at grade, substantially as before the advent of the highway.

The Legislature having given the Director of Highways the right to petition vacation under the provisions of Section 5553.041, which section was enacted after the case next hereinbefore cited, it can be said to have been fully aware of the alternatives existing, and to have intended, in a situation such as this, to provide the director with a remedy of vacation which could be considered independently of the alternative of providing a grade separation. The controlling issue is whether the road should be vacated and not whether an overhead should be built. In our opinion, it was thereby intended that in determining whether it was necessary for the public convenience and welfare to vacate a township road, as situated here, consideration should be given to the existing use of the road and the benefits and detriments inherent in its existing condition, including the intersection at grade. As there are no present plans to build an overhead bridge, and its use would, in all likelihood, be different than is the use of the existing road, evidence as to such use and speculative public benefit would have little, if any, value in determining whether a portion of the road, as presently constituted, should be vacated. On the other hand, as the Director of Highways may build an overhead, and federal standards may require him to do so if vacation is denied, considera-

tion must be given to evidence of probative value relating to the probable cost of constructing such overhead.

Let us examine the evidence in the light of these observations.

The landowners have testified as to the movement of their agricultural machinery on T-114 and across I-75 and contend that the road and the intersection should be kept open for such purpose. The state Legislature has already made it a criminal offense, by Section 4511.051, Revised Code, for any person to "occupy any space within the limits of the right of way of a freeway, with: * * * an agricultural tractor; farm machinery; except in the performance of public works or official duties." Although the existence of an intersection at grade takes the portion of I-75 under consideration out of the freeway category (Section 4511.01(WW), Revised Code), the intent and purpose of the federal standards relating to interstate highways is to eliminate or to separate all crossroads, which, upon accomplishment, will bring I-75 clearly within the definition of a freeway. Although not now criminal in the technical sense, the continued use of the existing interestion for the passage of agricultural tractors and farm machinery is certainly *contrary to* and does not serve the public welfare.

Although the president of the school board and the superintendent of schools testified that they considered it safe to route a school bus through the intersection, rather than into a nearby intersection of a county road and a state route and thence by overhead over I-75, the president testified that other school buses traveled over the latter route. It does not seem that what is considered safe enough for one bus should be considered too unsafe for another, or vice versa. We will take judicial notice instead from our own experience and from the many intersection collisions which we have reviewed, or have read about in the course of our review of others, that the perpendicular insertion into an interstate highway of a slowly moving school bus loaded with children proceeding from a stop across two lanes of high speed traffic, across a median too narrow to shelter its length, and thence across another two lanes of high speed traffic, is extremely dangerous to both the occupants of the bus as it is also to the vast number of cars and oc-

cupants thereof using the interstate highway, and is *contrary to* and does not serve the public welfare.

This leaves the fire truck, which may never again have occasion to use the intersection and has at least two alternate but slightly less fast or convenient routes by which it might travel, and the 22 to 39 vehicles per 24-hour period which have used, or might again use, T-114 to cross I-75. However, when we compare an average use of 1 - 1½ cars per hour on T-114, and a desire for availability of use instead of actuality of use by the fire truck, with actual use of I-75 by many thousands of vehicles per 24-hour period, we are not making a comparison between items of public welfare on one hand and different items of public welfare on the other. Instead, as indicated by the *City of Lakewood case, supra,* the comparison is between private or local self interest on the one hand and general welfare on the other. In view of the fact that the projection into I-75 of such cross traffic is only in the fulfillment of such private or local self interest and is bound to increase the hazards to the users of I-75, as well as to those persons so crossing, the continued crossing by these miscellaneous vehicles and the possible crossing by the fire truck is *contrary to* and does not serve the public welfare.

It appearing that the Director of Highways has adduced substantial evidence of probative value showing that it is necessary for the public convenience and welfare to eliminate the intersection of T-114 with I-75 by the vacation of a portion of T-114, and that the relevant evidence of the landowners supports the highway director's case rather than their own, in that it all shows the continued use of such intersection to be *contrary to* rather than as serving public welfare, there is, therefore, no conflict in the evidence, reasonable minds can arrive at only one conclusion, and that conclusion is that the vacation of that part of T-114, as described in the petition, is necessary for the public convenience and welfare.

Although their action could have no legal effect when taken while the appeal in the Common Pleas Court was pending, we note that the county commissioners did on second thought arrive at a similar conclusion when they found that "if said matter were now pending before them they would find

said improvement while not serving the public convenience and welfare of certain of the public in some respects nevertheless it would serve the public convenience and welfare of the greater majority of the public and the said Vacation should therefore be granted.''

We must, therefore, conclude on the evidence adduced before the Common Pleas Court that the original decision of the commissioners against the vacation was unreasonable as a matter of law. There being no conflict in any of the substantial evidence of probative value on the issue before the court, there was no occasion for the Common Pleas Court to ''weigh'' the evidence, and, for that reason only, it cannot be said that the judgment of the Common Pleas Court was against the manifest weight of the evidence as asserted by the appellant in his third assignment of error. Nor does this court measure the judgment of the Common Pleas Court by a standard of reasonableness, and for that reason only it cannot be said that the judgment of the Common Pleas Court was unreasonable as asserted by the appellant in his fourth assignment of error. However, there being no evidence to support it, that judgment was contrary to law and should be reversed.

To prevent such reversal, the appellee landowners assert by way of assignment of error that the commissioners had no jurisdiction of the proceedings to vacate because the statute (Section 5553.041, Revised Code) provides for the filing of a petition to vacate by the Director of Highways ''when in the construction or improvement of a state highway, in the opinion of the Director of Highways it is in the public interest to vacate a public highway or any portion thereof,'' and that in the instant case neither I-75 nor any other state highway was being constructed or improved, and the construction or improvement thereof had long since been completed. However, Section 5553.01 defines ''improvement'' as meaning ''any location, establishment, alteration, widening, straightening, vacation, or change in the direction of a public road, or part thereof, as determined upon by a board of county commissioners by resolution,'' and the state has contended that the improvement which authorizes the proceeding is the improvement (the vacation) petitioned for. This contention is somewhat like pulling oneself up by one's own bootstraps. In our opinion, the improve-

ment contemplated by Section 5553.041 is not the vacation of T-114 but is the improvement of I-75 by the elimination of a crossroad. In the course of improving I-75 by eliminating the crossroad the Director of Highways has various alternatives; he may build over the crossroad, build under it, or proceed to have it closed to public use, and, if in his opinion the latter is in the public interest, he may proceed to petition its vacation. We, therefore, are of the opinion that the conditions precedent to the filing of the petition and to the jurisdiction of the board of county commissioners existed and that the assignment of error of the landowners is without merit.

Finding that the vacation is necessary for the public convenience and welfare and that the original decision of the board of county commissioners to the contrary was unreasonable, this court reverses and vacates the judgment of the Common Pleas Court and, entering the judgment that that court should have entered, revokes the original action of the commissioners and directs them to proceed with the vacation as petitioned for.

*Judgment accordingly.*

YOUNGER, P. J., and MIDDLETON, J., concur.