**In re CERTIFICATE OF NEED APPLICATION OF PROVIDENCE HOSPITAL; Ohio Department of Health et al., Appellants.**

[Cite as *In re Certificate of Need Application of Providence Hosp.* (1990), 67 Ohio App.3d 391.]

Court of Appeals of Ohio,
Franklin County.

Nos. 89AP–651, 89AP–685.

Decided April 19, 1990.

**392**

*Bricker & Eckler, Gretchen A. McBeath, Scott W. Taebel* and *Michael Gire,* for appellee.

*Anthony J. Celebrezze, Jr.,* Attorney General, and *Gay Lynn Rice,* for appellant Ohio Department of Health.

*Taft, Stettinius & Hollister, John McCoy* and *Raymond W. Lembke,* for appellant Good Samaritan Hospital.

---

PEGGY BRYANT, Judge.

In this consolidated appeal, appellants, Good Samaritan Hospital ("Good Samaritan") and the Ohio Department of Health ("ODH"), appeal from the common pleas court's reversal of an order of the Certificate of Need ("CON") Review Board.

On April 22, 1983, appellee, Providence Hospital, located in Hamilton County, filed an application for a CON with ODH, then known as the State Health Planning and Development Agency ("SHPDA"). The application proposed a twenty-four bed obstetric unit be added to the hospital. However, because of a legislatively mandated "moratorium" on CONs, SHPDA did not begin to review appellee's CON application until July 1984. In March 1985, the director of ODH denied the certificate of need, after which appellee appealed to the CON Review Board pursuant to R.C. 3702.58.

A board-appointed hearing examiner conducted a hearing on the matter from August 1985 to January 1986. In July 1986, the hearing examiner submitted his report and recommendation to the board. Although the hearing examiner's findings of fact and conclusions of law were generally favorable to appellee's application, he recommended that the board remand the matter:

"For further consideration regarding the bed need calculation and ultimate demand of bed need in the future based upon all the components relative to obstetrical demand years, and the cost benefit analysis of the project as applied for, vis-a-vis, its impact on the medical facilities within the HSA–1 and the consumer."

Appellant Good Samaritan, which had intervened in the proceedings, and appellant ODH filed objections to the report with the board, while appellee filed objections to the hearing examiner's recommendation. On December 22, 1986, the board issued an order denying appellee a CON. The board based its decision in part upon the board's own "additional Findings of Fact and Conclusions of Law independent from those found by the Hearing Examiner."

Appellee appealed the board's decision to the Franklin County Court of Common Pleas in January 1987.[1] On April 27, 1989, the common pleas court reversed the board's decision and granted appellee a certificate of need.

Appellants have appealed the common pleas court decision to this court. Appellee, though, has moved to dismiss the case, contending that both appellants should be dismissed as parties.

██ Appellee's argument to dismiss appellant ODH relies upon the language of R.C. 119.12, which states, in part:

" * * * [A]ppeal *by the agency shall be taken on questions of law relating to the constitutionality, construction, or interpretation of statutes and rules of the agency,* and in such appeal the court may also review and determine the correctness of the judgment of the court of common pleas that the order of the agency is not supported by any reliable, probative, and substantial evidence in the entire record." (Emphasis added.)

This court has held that, "within the meaning of Section 119.12, Revised Code, an 'interpretation' refers to a *specific* finding by the trial court as to the meaning or application of a *particular* statute or regulation." *Mentor Marinas v. Bd. of Liquor Control* (1964), 1 Ohio App.2d 219, 223, 30 O.O.2d 252, 254, 204 N.E.2d 404, 408. In the present case, appellee argues that the trial court did not make a finding on the meaning or application of a particular statute because the sole basis of the trial court's decision, according to appellee, was the court's finding a lack of reliable, probative, and substantial evidence.

However, we find that the trial court's decision interpreted R.C. 119.09. The trial court stated in its opinion that:

" * * * The Board's authority to modify decisions of its hearing examiners is set forth in R.C. Section 119.09. That section indicates that the Board may approve, modify, or disapprove an examiner's recommendations; *it does not authorize modification of an examiner's findings of fact and conclusions of law.* * * *

" * * * This Court find that such a gross modification of the examiner's report clearly exceeds the Board's statutory powers under R.C. Section 119.09." (Emphasis added.)

The trial court then stated:

---

1. Subsequent to the common pleas court's decision in this case, Am.Sub.H.B. No. 332 amended R.C. 3702.58(E) to provide for a direct appeal from the board to the Franklin County Court of Appeals, rather than to the court of common pleas.

"Further, this Court finds that the Board's independent findings and conclusions are not supported by reliable, probative, and substantial evidence. * * * "

As such, the trial court's factual determination was an alternative basis for its decision, not the sole basis. None of the case law appellee cites indicates that an agency cannot appeal from an alternative ground for a decision, and we will not read that restriction into the statute.

In addition, we note that, in a previous case, we found that the identical issue of the relationship between a board and its hearing examiner under R.C. 119.09 was appealable by an agency. See *Blinn v. Ohio Bur. of Emp. Serv.* (1985), 29 Ohio App.3d 77, 29 OBR 88, 502 N.E.2d 665. Indeed, the trial court's interpretation of R.C. 119.09 in *Blinn* was much less explicit than the trial court's interpretation in the present case. See *id.* Accordingly, we deny appellee's motion to dismiss appellant ODH.

■ Appellee also contends that we should dismiss appellant Good Samaritan from the appeal, since Good Samaritan did not involve itself in the proceedings in the court of common pleas. Good Samaritan, though, argues that even though it did not file a brief with the common pleas court, it was a party to appellee's appeal from the board's order because Good Samaritan had been an adverse party to appellee in the proceedings before the board.

In support, Good Samaritan cites *In re Vacation of Road* (1966), 6 Ohio App.2d 73, 77, 35 O.O.2d 176, 178, 216 N.E.2d 768, 772, which states " * * * in every appeal, unless otherwise prescribed, the adversary parties in the original proceedings who are not parties appellant automatically become parties appellee. * * * " In later cases, the Ohio Supreme Court has followed the principle stated in *In re Vacation.* See *Thomas v. Webber* (1968), 15 Ohio St.2d 177, 181, 44 O.O.2d 150, 152, 239 N.E.2d 26, 29; *Gold Coast Realty v. Bd. of Zoning Appeals* (1971), 26 Ohio St.2d 37, 40, 55 O.O.2d 20, 22, 268 N.E.2d 280, 282. Appellee argues in response that the bases for the decisions in *Thomas* and *Gold Coast* are inapplicable to R.C. 119.12 appeals. While the *Thomas* and *Gold Coast* decisions did involve R.C. Chapter 2506 appeals from an agency of a political subdivision, in contrast to R.C. 119.12 appeals from a state agency, the Supreme Court's reasoning would apply to administrative appeals in general. In *Thomas,* for example, the court found that township freeholders and electors "would be parties to the Common Pleas Court appeal" because they were "adverse and necessary parties." *Id.* at 181, 44 O.O.2d at 152, 239 N.E.2d at 29. Here, Good Samaritan intervened in the proceedings before the board as a party adverse to appellee; consequently, Good Samaritan was a party to appellee's appeal to the common pleas court. We therefore deny appellee's motion to dismiss Good Samaritan.

In regard to the merits of the case, appellant ODH assigns the following three errors:

"1. The Court of Common Pleas erred in construing the provisions of R.C. § 119.09 to prohibit the state certificate of need review board from substituting its judgment on issues of law and fact for that of its hearing examiner.

"2. The Court of Common Pleas erred in finding that the board's order denying Providence Hospital a certificate of need for a 24-bed level I obstetrics unit was not supported by reliable, probative and substantial evidence.

"3. Upon reversing the board's order, the court of common pleas abused its discretion in failing to remand this case back to the Department of Health for reconsideration."

Appellant Good Samaritan assigns the following two errors:

"1. The court below committed error by reversing the CON review board and ordering the issuance of a certificate of need based upon the erroneous conclusion that the CON review board lacked authority to reject the recommendation of its hearing examiner based upon the board's own findings and conclusions.

"2. The court below committed error by reversing the CON review board and ordering the issuance of a certificate of need based on its erroneous conclusion that the CON review board's denial of Providence's CON application was not supported by reliable, probative and substantial evidence."

In their respective first assignments of error, appellants contend that the common pleas court erred when it ruled that R.C. 119.09 does not permit the board to modify the findings of fact and conclusions of law of the board's hearing examiner. Appellee's opposing argument relies upon language in R.C. 119.09, which provides in part:

" * * * The party may * * * file with the agency written objections to the report and recommendation, which objections shall be considered by the agency before approving, modifying, or disapproving the recommendation. * * * The recommendation of the referee or examiner may be approved, modified, or disapproved by the agency, and the order of the agency based on such report, recommendation, transcript of testimony and evidence, or objections of the parties, and additional testimony and evidence shall have the same effect as if such hearing had been conducted by the agency. * * * [I]f the agency modifies or disapproves the recommendations of the referee or examiner it shall include in the record of its proceedings the reasons for such modification or disapproval."

Appellee contends that R.C. 119.09 distinguishes the hearing examiner's report from his recommendation, and that the statute further provides that only the recommendation "may be approved, modified, or disapproved," not the findings of fact in the report. However, the statute also provides that the agency's order may be " * * * based on such report, recommendation, transcript of testimony and evidence, or objections of the parties * * *." Because this part of R.C. 119.09 refers to the "transcript of testimony and evidence," the statute permits the board to independently review the evidence, and to make its own findings and draw its own conclusions from the evidence.

Moreover, the case law does not support appellee's interpretation; in fact, this court stated in *Blinn v. Ohio Bur. of Emp. Serv., supra,* 29 Ohio App.3d at 80, 29 OBR at 91, 502 N.E.2d at 669, that:

"The trial court incorrectly held that the factual findings of the hearing examiner were to be given deference over factual findings by the board, since, pursuant to R.C. 119.09, the board can make *de novo* factual findings if supported by the record * * *." See, also, *Pushay v. Walter* (Sept. 20, 1984), Franklin App. No. 83AP–1103, unreported, 1984 WL 5901, reversed on other grounds (1985), 18 Ohio St.3d 315, 18 OBR 361, 481 N.E.2d 575; *Dietz v. State* (June 29, 1984), Lake App. No. 10–079, unreported, 1984 WL 7391 ("We conclude that, under R.C. 119.09, the agency is the ultimate fact-finder."). Cf. *West Virginia v. Hazardous Waste Facility Approval Bd.* (1986), 28 Ohio St.3d 83, 87, 28 OBR 179, 183, 502 N.E.2d 625, 630 (court noting, without disapproval, that "[t]he board chose to reject the first recommendation based on its own findings").

We sustain appellants' first assignments of error.

■■■ In their second assignments of error, appellants address the trial court's finding that the board's order was not supported by reliable, probative, and substantial evidence. Our function in regard to this issue is to determine whether the common pleas court abused its discretion in making the finding. *Kinney v. Dept. of Adm. Serv.* (1984), 14 Ohio App.3d 33, 35, 14 OBR 37, 39, 469 N.E.2d 1007, 1009. "[T]he term 'abuse of discretion' connotes more than an error of judgment; it implies a decision without a reasonable basis, one which is clearly wrong." *Angelkovski v. Buckeye Potato Chips Co.* (1983), 11 Ohio App.3d 159, 161–162, 11 OBR 242, 243–245, 463 N.E.2d 1280, 1282–1283. In the present case, one difficulty in finding that the trial court had, in fact, "a reasonable basis" for its decision is that the court did not specify any particular aspect of the board's order that was unsupported by reliable, probative, and substantial evidence.

Appellants first argue that the common pleas court abused its discretion because it failed to recognize that the board was required to comply with the

state health plan. The term "state health plan," in this context, refers to "The Ohio State Health Plan, Acute Care Component: 1984 Edition," which the Statewide Health Coordinating Council promulgated. The state health plan set a need of only three hundred eight obstetric beds in 1988 for health service area 1 ("HSA–1"), an eight-county area in which Providence is located. *Id.* at 16. The evidence at the hearing showed that the actual number of obstetric beds in HSA–1 in 1985 (the time of the hearing) was at least four hundred forty-seven. Hamilton County, in which Providence is located, contained three hundred twenty-eight beds. If compliance with the numerical limits of the plan were mandatory, then the board could not have granted Providence its CON.

■ Appellants base their argument of mandatory adherence to the state plan upon R.C. 3702.53(D), which, at the time the board rendered its decision, stated:

"Any decision of the state agency to grant or deny a certificate of need, including a conditional approval under division (E) of this section:

"(1) *Shall* be consistent with the state health plan[.]" (Emphasis added.)

When a statute uses the word "shall," a court must construe the statute "as imposing a mandatory duty, unless there appears a clear and unequivocal legislative intent that it receive a meaning other than its ordinary meaning." *State, ex rel. Niles, v. Bernard* (1978), 53 Ohio St.2d 31, 34, 7 O.O.3d 119, 121, 372 N.E.2d 339, 341, fn. 2. See, also, *State v. Herbert* (1976), 49 Ohio St.2d 88, 91–92, 3 O.O.3d 51, 53–54, 358 N.E.2d 1090, 1092–1093. No clear intent to make compliance permissive appears in R.C. 3702.53; arguably, then, R.C. 3702.53(D)(1) imposes a mandatory duty upon the board to be consistent with the state health plan.

Appellee cites several decisions of this court to refute the idea that compliance with the plan is mandatory. However, those decisions are distinguishable. Neither *Mid–Ohio Health Planning Fed. v. Certificate of Need Review Bd.* (Apr. 1, 1982), Franklin App. No. 81AP–958, unreported, 1982 WL 4084, nor *In re New London Medical Service Group, Inc.* (June 21, 1979), Franklin App. No. 78AP–719, unreported, stated that compliance was mandatory; however, both of these cases antedated the mandatory language of R.C. 3702.53(D)(1). Nevertheless, appellee contends that the decisions demonstrate that this court has generally rejected "blind adherence" to strict numerical limits, since, although the requirement in R.C. 3702.53 did not exist at the time, Section 300m–6(a)(5), Title 42, U.S.Code, required compliance with state plans. However, the *Mid–Ohio* and *New London* courts did not address the effect of Section 300m–6(a)(5) or even refer to it in their opinions; thus, the cases take no position on statutes, either state or federal, that seemingly

require adherence to a state plan. Similarly, another case appellee cites, *Oak Park Manor v. State Certificate of Need Review Bd.* (1985), 27 Ohio App.3d 216, 218, 27 OBR 256, 258, 500 N.E.2d 895, 897, is distinguishable because the rule at issue in that case explicitly "mandated using the formula to determine bed need as *one* of many factors to be considered in weighing the need for additional beds."

In the final analysis, though, we need not determine whether the provisions of the plan are mandatory, as reliable, probative, and substantial evidence independent of the health plan's formula supports the board's decision. Indeed, appellants presented several arguments to support their contention of no need for appellee's project.

Initially, appellants presented evidence that the percentage of occupancy of obstetrical beds in Hamilton County, even without the Providence project, would be 62.2 percent by 1990. The board found, and the record supported its finding, that "a 75% occupancy standard must be maintained to assure high quality of care in providing obstetrical services." In addition, appellants cited statistics showing that the average length of stay for obstetrical patients had decreased nationally, in Ohio, and in Hamilton County, in the years 1980 to 1984. The declining lengths of stays meant that the same amount of obstetrical beds could handle more patients. Moreover, the statistics showed that fertility rates had increased only slightly in Hamilton County alone from 1980 to 1984, and that rates decreased nationally and in Ohio in general.

However, Providence presented contrary statistics to the effect that the number of live births in Hamilton County had increased from 19,100 in 1980 to 19,926 in 1984. Providence also presented evidence at the hearing projecting that the number of births in Hamilton County would be greater in 1985 than in 1984. In addition, the chairman of Obstetrics and Gynecology at Ohio State University Hospital and the director of obstetrics and gynecology at Good Samaritan both testified that an occupancy rate of less than seventy-five percent was in the permissible range.

Although conflicting evidence existed, a common pleas court in R.C. 119.12 appeals "must give due deference to the administrative resolution of evidentiary conflicts." *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 111, 17 O.O.3d 65, 67, 407 N.E.2d 1265, 1267. If substantial evidence, "albeit disputed evidence," supports an agency's findings, then "courts are not free to set [the findings] aside even though the courts could have drawn different inferences" from the evidence. *T. Marzetti Co. v. Doyle* (1987), 37 Ohio App.3d 25, 29, 523 N.E.2d 347, 352. We conclude that, when the board's resolution of conflicting evidence is given due deference, appellants' evidence of occupancy rate, length of stay, and fertility rates constituted reliable,

probative, and substantial evidence supporting the board's conclusion that appellee did not demonstrate need for its project.

Second, appellants presented evidence that the type of facility appellee proposed was not needed in Hamilton County. Appellee's proposed obstetrics unit would be a "Level I" facility, the lowest level of obstetrical hospital in Ohio. Ohio's "State Perinatal Guidelines" described level I obstetric hospitals as:

"* * * Hospitals with ambulatory care facilities whose function is to provide services primarily for uncomplicated maternity and newborn patients. The number of deliveries in these hospitals is too low to provide an adequate economic base for complex obstetric and newborn care and to provide the caseload needed to attract the staff necessary for more complex care."

In contrast, level II and III hospitals are equipped to provide more complex care, although they are also capable of providing level I services. In its order, the board found that:

"A Level-I obstetrical unit is not needed in an urban area. The medical testimony elicited at the hearing was that a Level I institution is more appropriate in a rural setting where there is no access to Level II and Level III hospitals."

As an example of the medical testimony, Dr. Donald J. Frank, director of pediatrics and neonatology at Good Samaritan testified "I think the level I facilities belong in geographically remote areas; not in urban communities." Dr. James R. Kimmey, president of the "Institute for Health Planning," and Dr. Frederick P. Zuspan, chairman of obstetrics and gynecology at Ohio State University, agreed with Dr. Frank's statement. Drs. Zuspan and Frank also testified that babies that had to be transferred from a level I to a level III hospital faced a greater health risk than babies that started out in a level III hospital. In addition, Drs. Zuspan and Frank testified that a certain percentage of problem deliveries are unpredictable, meaning delivery of unexpectedly "distressed infants" could occur at Providence's facility, necessitating transfer to a level III hospital. Moreover, Dr. Frank testified that obstetricians would be reluctant to use a level I facility and expose themselves to the risk of a malpractice suit arising out of their failure to take advantage of "a more sophisticated environment" in the same community. Reluctance on the part of obstetricians may be important because evidence at the hearing indicated that obstetricians, rather than their patients, usually choose the particular hospital in which delivery will take place.

In its brief, appellee attempts to contradict appellants' evidence by citing the testimony of the president of a hospital consulting firm, who testified that eighty-four percent of the hospitals in the United States with obstetric units

are at level I and that sixty percent of all deliveries in the United States occur at level I hospitals. The witness also testified that eleven of seventeen obstetric programs in the Cleveland area are at level I. However, these statistics do not negate the medical testimony: the fact that urban areas presently contain hospitals with level I facilities, many of which may antedate the CON Review Board, does not necessarily imply that the board should permit urban hospitals to continue to construct level I facilities.

Appellee also cites the State Perinatal Guidelines, which did not state that level I facilities are inappropriate in urban areas. Appellee further supports its argument with the testimony of John H. Ackerman, who was director of the Ohio Department of Health when the department developed the level I, II, and III terminology. Ackerman testified that "[t]he general concept was that most of the hospitals in the state of Ohio who did obstetrics would be at the level I." However, we conclude that, despite some conflicting evidence, substantial evidence supported the board's findings on this issue.

In regard to a somewhat related issue, appellee disagrees with the board's twenty-second finding of fact, which stated "There is no evidence that a free-standing Level I facility will be any more cost-effective than the Level I portion of a Level–II facility." The board's statement that *no* evidence existed was technically incorrect, since the evidence before the board included a Price Waterhouse cost analysis concluding that Providence's cost per delivery would be less than other Cincinnati-area hospitals. Any overstatement by the board, though, was insignificant because substantial evidence supported the board's basic conclusion. John Abendshien, Ernst & Whinney's national director of health care planning, testified that "item by item or service by service, the level 1 portion of a level 2 facility is going to be as cost effective if not more than a free-standing level 1 facility." Abendshien's expert testimony, notwithstanding the Price Waterhouse analysis, constituted reliable, probative, and substantial evidence upon which the board could rely for its finding.

Finally, in support of their contentions of no need for appellee's project, appellants assert that the evidence also supported the board's eleventh conclusion of law, which states: "The proposed project would adversely affect utilization rates and other aspects of the area's health care system and no over-riding justification has been provided by Providence Hospital." This conclusion of law derives from Ohio Adm.Code 3701–12–21(E) which, since its amendment in September 1984, states as follows:

"Each applicant for a certificate of need relating to a hospital shall document the effect, if any, that the project will have on other health care facilities or HMOs in the trade service area and on the trade service area's

overall health care costs. If the project will have an adverse effect on utilization rates or other aspects of the area's health care system, the SHPDA shall not approve the application unless the applicant provides an overriding justification for the project."

▮ Apart from contentions about the adequacy of the evidence regarding adverse impact on utilization rates, appellee raises two preliminary arguments which we address first. Initially, appellee argues that the board erred by not confining its analysis to Providence's "trade service area" as Ohio Adm.Code 3701–12–21(E) requires. Before the board, appellee argued that its trade service area coincided with its "Primary Service Area for Proposed Women's Center," an eleven zip code area north and west of downtown Cincinnati. Appellee was very specific in designating this area, since the area's boundaries differed slightly from the boundaries of appellee's general "Primary Service Area." In its order, though, the board stated that appellee was "gerrymandering" and rejected Providence's proposed service area. Noting that "there is nothing in the record as to how or why Providence designated that eleven zip code zone as its Trade Service Area," the board also said that, "[s]ince Providence is the appealing party, Providence has the evidentary [*sic* ] burden of proving the nature of its Trade Service Area. Providence has failed to meet that burden." Instead of employing appellee's proposed service area, the board essentially adopted the approach of the SHPDA consultant who reviewed Providence's application, which consisted of applying the "adverse impact" test of Ohio Adm.Code 3701–12–21(E) to the entire health service area.

We conclude that the board's actions were consistent with Ohio Adm.Code 3701–12–21, since Ohio Adm.Code 3701–12–21(A) states:

*"For the purposes of this rule, 'trade service area' means an area that may be smaller than or equal to a health service area, that may include parts* of two or more health service areas, and that represents the pattern of care for a specific service sought by patients residing in the geographic area." (Emphasis added.)

▮ Appellee next contends that it did not receive a "fair opportunity" to address the adverse impact test in Ohio Adm.Code 3701–12–21(E). In July 1984, appellant SHPDA asked appellee to file a supplemental application addressing the CON criteria in the version of Ohio Adm.Code 3701–12–21 promulgated in June 1984. Appellee seems to be arguing that it had no opportunity to respond to the rule's criteria because the language of the version of Ohio Adm.Code 3701–12–21 in force between June and September 1984 differed from the language of the post-September 1984 rule that the board relied upon in its order. Instead of using the term "trade service area,"

then-current Ohio Adm.Code 3701–12–21(D) referred to the adverse impact on "other health care facilities or HMOs in the area and on the health service area's overall health care costs." Appellee suffered no prejudice from the rule's amendment, though, since the language of the rule as it stood in July 1984 put appellee on notice that they would have to present adverse impact evidence relating to the entire HSA, which is the test SHPDA and the board actually applied. In short, appellee's argument would be more appropriate in a case in which ODH instructed an applicant to address criteria and then applied altogether different criteria.

Aside from the foregoing arguments, we find that reliable, probative, and substantial evidence supported the board's adverse impact determination. Providence's application said Providence intended to capture forty-five percent of the market in its service area within two years. At the hearing, a vice president at Good Samaritan presented a chart that showed the loss of patients that would have occurred if the proposed unit had existed in 1984. The chart showed the loss to individual hospitals in the eleven zip code area that Providence had designated as its service area; in particular, the chart projected that appellant Good Samaritan would have lost eight hundred seventy-three of one thousand nine hundred forty-one deliveries to Providence. Similarly, an assistant vice president at Christ Hospital in Cincinnati projected that Christ Hospital would have lost five hundred patients in 1984 from a nine zip code area.

In addition, one of appellee's experts, Edward L. Krommer, Jr., of Price Waterhouse, admitted that Providence's obstetric unit would lead to an approximately twenty percent decline in births at Good Samaritan. Dennis B. Meulemans, a consultant with Ernst & Whinney, testified that a twenty percent reduction in utilization would have no effect on fixed overhead costs; and that, based upon the 1984 data, the Providence unit would result in an excess cost to Cincinnati hospitals of over $2 million, "which the community would have to absorb in other services, or rates increases in the obstetric services for these particular institutions to cover the added burden of having less deliveries provided in that particular institution." Providence's witness Krommer testified that, even assuming "Good Samaritan Hospital reduced all the variable costs that it possibly could," the proposed unit would cause a decline in Good Samaritan's income by over five percent. Furthermore, John Abendshien of Ernst & Whinney testified that, without the same volume of deliveries, hospital revenue would not suffice "to support teaching programs" and "to keep up with changing technology"; consequently, "quality is going to drop." Dr. Kimmey of the Institute for Health Planning stated that the loss of revenue due to loss of patients would hinder the institution's ability to provide indigent care.

Although appellee presented evidence that conflicted with some of the preceding testimony, we find the evidence supported the board's "adverse impact" determination, especially since appellee points to no "overriding justification for the project" under Ohio Adm.Code 3701–12–21(E).

Finally, we address two remaining issues that appellee has raised: (1) the effect of the boundaries of HSA–1 on the accuracy of the state health plan; and (2) travel time. First, appellee cites the testimony of an official from the ODH that, because the state's bed need formula is primarily based upon HSAs and not counties, the formula did not "account for geographic variations in locations of beds," meaning that the formula could have misrepresented bed need in a given county if the county had an increased need, but the HSA as a whole had a declining need. However, regardless of the criticisms of the geographical scope of HSA–1, appellants presented sufficient Hamilton County specific evidence, independent of the formula, to support the board's decision.

■ Appellee's argument on the issue of travel time focuses on Ohio Adm.Code 3701–12–21(E), which, from June 22, 1984 to September 10, 1984, stated:

"(E) Proposed acute care facilities or services shall be within thirty minutes travel time for ninety per cent of the population of the health service area, except for beds that will be registered in the following categories, which shall be within sixty minutes travel time:

"(1) Physical rehabilitation;

"(2) Alcohol and drug rehabilitation; or

"(3) Psychiatric."

Appellee contends that this rule required the board to grant appellee a CON, since the evidence showed that only eighty-three percent of the women in Providence's proposed service area were within thirty minutes' travel time of an obstetrical provider. By its terms, though, the rule did not require the board to issue a certificate of need when less than ninety percent of a health service area's population was within thirty minutes' travel time of existing facilities. Instead, the rule required *proposed* facilities to meet the ninety percent requirement.

■ Appellee also cites *Mid–Ohio Health Planning Fed., supra,* which declares that "the state and national standard for accessibility to a hospital is that travel time to the facility shall not ordinarily exceed 30 minutes." However, even assuming that the board should have considered the thirty-minute standard of *Mid–Ohio* in reviewing appellee's application, the evidence that eighty-three percent of the relevant population lived within thirty minutes

of an obstetrical service was substantial support for the board's finding that "[t]ravel time to an obstetrical facility is not a significant factor."

Based on the foregoing, we sustain appellants' second assignments of error.

Lastly, we address appellant ODH's third assignment of error, which asserts that the common pleas court had no authority to grant a CON and should have remanded the case to ODH. ODH's one paragraph discussion of this assignment is not particularly illuminating; however, ODH is apparently arguing that the common pleas court could not grant Providence "a certificate of need outright" because even the hearing examiner had not granted the CON. However, the language of R.C. 119.12 is expansive enough to allow a court to reach a result that had not been reached below. R.C. 119.12 states that the court, besides affirming the agency's order, "may reverse, vacate, *or modify* the order *or make such other ruling* as is supported by reliable, probative, and substantial evidence and is in accordance with law." (Emphasis added.) In theory, then, the common pleas court has wide discretion in making its ruling, as long as the ruling meets the general requirement of being supported by the evidence. We therefore overrule appellant ODH's third assignment of error.

Nevertheless, because we have sustained appellants' first and second assignments of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Motions to dismiss overruled;*
*judgment reversed*
*and cause remanded.*

STRAUSBAUGH and RADCLIFFE, JJ., concur.

GERALD E. RADCLIFFE, J., of the Ross County Court of Common Pleas, sitting by assignment.